In re GENERAL PLASTICS CORP.,
Debtor-in-Possession.

CAPITAL FACTORS, INC.,
Plaintiff/Counterdefendant,

v.

HOMELINE CORPORATION, Arthur
O. Knutson, and Hilda F.
Knutson, Defendants.

and

General Plastics Corporation and First
Union National Bank of Florida,
Defendants/Counterplaintiffs.

Bankruptcy No. 91–12375–BKC–AJC.
Adv. No. 91–0579–BKC–AJC–A.

United States Bankruptcy Court,
S.D. Florida.

Aug. 19, 1993.

Michael W. Ullman, Richard A. Warren, Ullman & Ullman, North Miami Beach, FL, for General Plastics.

Paul D. Friedman, Friedman Rodriguez & Ferraro, Miami, FL, for Capital Factors.

## CONTENTS

|  |  | Page |
|---|---|---|
| Introduction |  | 262 |
| **FINDINGS OF FACT** |  | 263 |
| I. | The Parties | 263 |
| II. | The Original Factoring Agreement | 263 |
|  | A. Assignment of Invoices to Capital Factors | 265 |
|  | B. Definition and Effect of Pre–Billing | 266 |
|  | C. Advancement of Funds Against Assigned Invoices | 266 |
|  | D. Computing Interest Charges and Factoring Commissions | 268 |
|  | E. Summary | 270 |
| III. | Relevant Events from April 1986 through June 1990 | 270 |
|  | A. Advances Starting in 1986 and Discovery of Pre–Billing in 1987 | 270 |
|  | B. The 1988 Amendment to the Agreement | 271 |
|  | C. Capital Factors' June 1990 Reduction in the Advance Rate from 85% to 70% | 272 |
| IV. | Relevant Events from June 1990 to March 1991 | 274 |
|  | A. General Plastics' Shipments Via Its Own Trucks | 274 |
|  | B. General Plastics' Continuing Losses | 274 |
|  | C. The January 1991 Amendment to the Agreement | 275 |
|  | D. Events from January to March 1991 | 275 |
| V. | Capital Factors' Termination of the Factoring Relationship in March 1991 | 276 |
|  | A. Discovery of Pre–Billing on March 14 | 276 |
|  | B. Suspension of Funding on March 18 | 277 |
|  | C. Termination of the Agreement on Tuesday, March 19 | 278 |
| VI. | Post–Termination Events | 280 |
|  | A. The Contractual Relationship Ends in April 1991 | 280 |
|  | B. General Plastics' Creditors Make Competing Claims Against General Plastics' Receivables After March 19 | 280 |
|  | C. Payments by Capital Factors to General Plastics' Creditors in March and April of 1991 | 282 |
|  | D. Capital Factors' Interpleader Action | 282 |
|  | E. Summary | 283 |
| **CONCLUSIONS OF LAW** |  | 283 |
| Jurisdiction |  | 283 |
| I. | Breach of Contract Claims | 283 |
| II. | Bad Faith Claims | 286 |
| III. | General Plastics' Tort Claims | 287 |
|  | A. Conversion and Civil Theft | 287 |
|  | B. Tortious Interference with Advantageous Business Relationships | 288 |
| IV. | General Plastics' Request for Accounting | 289 |
| V. | Remaining Issues | 290 |
| **CONCLUSION** |  | 291 |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING LIABILITY ISSUES IN GENERAL PLASTICS CORPORATION'S COUNTERCLAIM AGAINST CAPITAL FACTORS, INC.

JACK B. SCHMETTERER, Bankruptcy Judge, Sitting by Assignment and Designation.

### *INTRODUCTION*

Capital Factors, Inc. formerly factored the accounts receivable of General Plastics, Inc. This proceeding originated out of an interpleader action instituted by Capital Factors in Florida state court on May 13, 1991, regarding a fund claimed by General Plastics and others. The defendants named were General Plastics Corporation, the Internal Revenue Service, and First Union National Bank of Florida. General Plastics removed the interpleader to this Court after it became a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1101, *et seq*. The interests of the Internal Revenue Service and the First Union Bank have since been resolved, and they were dismissed. There remains no fund in dispute under the interpleader.

However, Capital Factors and General Plastics remain in dispute here. General Plastics answered the interpleader and raised affirmative defenses, asserting that Capital Factors was not entitled to interpleader relief and that General Plastics was the only entity with a valid claim to the fund. General Plastics also filed an amended counterclaim against Capital Factors containing seven counts. That counterclaim, which seeks various relief including alleged extensive damages, is the basis for pending disputes.

Counts I, II, and VII allege that Capital Factors breached its factoring agreement with General Plastics. Specifically, General Plastics alleges in Count I that Capital Factors failed to make advances and payments as required under that agreement, and that it failed to pay General Plastics monies due when Capital Factors allegedly terminated that agreement. General Plastics alleges in Count II that Capital Factors failed to give proper notice of its supposed termination, that it failed to advance funds at a rate of 85% of the value of accounts receivable assigned to it by General Plastics, and that it "manipulated General Plastics to serve its own pecuniary interests and the interests of parties not a party to the Factoring Agreement." Counterclaim, ¶ 10. General Plastics alleges in Count VII that Capital Factors failed to make "purchase price" payments (a term defined and discussed in the Findings below) as required by the factoring agreement, and that it failed to make such payments when the factoring agreement was terminated.

In Count III, General Plastics alleges that Capital Factors committed "tortious interference with advantageous business relations". Capital Factors allegedly interfered with General Plastics' relations with its customers and suppliers by improperly withholding funds that were due to General Plastics thereby causing General Plastics to lose these valuable relationships.

In Count IV, General Plastics seeks an accounting for all accounts receivable that were administered and collected by Capital Factors under the factoring agreement. The prayer for relief in this Count rests on allegations that Capital Factors did not make payments or assess charges in accord with the factoring agreement.

In Count V, General Plastics alleges common law conversion. The basis for this claim is an allegation that, after Capital Factors supposedly stopped making payments to General Plastics, it held monies otherwise due to General Plastics for the benefit of itself and Capital Bank. This allegation is repeated in Count VI, to form the basis for an allegation of civil theft under Florida law.

Capital Factors has denied any liability under the counterclaim, and maintains that it was properly entitled to file its interpleader action.

By agreed order, the Court bifurcated the issues of liability arising out of General

Plastics' affirmative defenses and counter-claim pursuant to Fed.R.Civ.P. 42(b) (Fed. R.Bankr.P. 7042). A bifurcated trial on liability issues was then held and the parties rested. Final argument was taken by Proposed Findings of Fact and Conclusions of Law filed by the parties. Having considered the exhibits, testimony, and arguments of counsel, the Court now makes and enters Findings of Fact and Conclusions of Law:

In these Findings and Conclusions, the original factoring agreement between the parties will be analyzed to resolve factual issues arising out of the interpretation of that document. Further, the course of conduct between the parties will be examined in order to resolve disputes over Capital Factors' calculation of interest and other charges as well as other technical issues. This discussion includes mechanics of the factoring relationship and events relevant to the counterplaintiff's allegations. Also discussed are two amendments to the factoring agreement and their effect on obligations of the parties. Further, events during and after March 1991 are examined to determine the effect of these parties' conduct on the factoring relationship and on their respective rights to accounts receivable collected during that period. The discussion here resolves all liability issues tried in the bifurcated trial.

### FINDINGS OF FACT

### I. *The Parties*

1. General Plastics is a Florida corporation engaged in manufacturing newspaper bags, can liners, and plastic trash bags for sale to newspapers, supermarkets, and industrial and commercial users.

2. Capital Factors is a Florida Corporation engaged in the business of providing credit collection and accounts receivable management services through factoring relationships with its clients. Capital Factors also provides financing to some of its clients.

3. The Capital Bank held a loan secured by a mortgage on real property owned by Arthur Knutson, the sole shareholder of General Plastics. Capital Bank's loan was guaranteed by General Plastics. Capital Factors and Capital Bank shared some common directors. However, Capital Factors has at all times mentioned here operated as an entity apart from Capital Bank, although sometimes cooperating together.

4. In 1985, General Plastics granted Florida National Bank (now known as First Union National Bank of Florida and referred to herein as "First Union") a first priority security interest in its accounts receivable and other assets as a part of collateral for mortgage financing on its physical plant. That security interest was perfected by a financing statement filed with the Florida Secretary of State on August 15, 1985.

### II. *The Original Factoring Agreement*

5. In early 1986, General Plastics owed $818,000 to the IRS for delinquent payroll taxes, but efforts to obtain additional financing from First Union to pay that obligation were unavailing. Consequently, General Plastics entered into a Factoring Agreement dated April 24, 1986 with Capital Factors (the "Agreement").

6. Under the Agreement, General Plastics was obliged to assign its accounts receivable to Capital Factors. Paragraph 1 of the Agreement states "You [General Plastics] hereby appoint us [Capital Factors] your sole factor for and hereby sell and assign to us, making us the absolute owner thereof, all your accounts...." General Plastics Ex. 3.

7. In return for the assignment of receivables, Capital Factors agreed to pay General Plastics a "Purchase Price", the amount of which was calculated as,

> the Net Invoice Amount [of each receivable] less our factoring commission.... the term 'Net Invoice Amount' shall mean the invoice amount of the Receivable, less returns ..., all selling discounts, and credits or deductions of any kind

allowed or granted to or taken by the customer

*Id.* at ¶ 4(a). The "factoring commission" consisted of .5% of the "Net Invoice Amount". *Id.* at ¶ 5.

8. The timing of Capital Factor's payments to General Plastics was set by the Agreement:

> The purchase price ..., less (i) any reserves that we in our sole discretion determine to hold, (ii) monies remitted, paid, or otherwise advanced by us to you or for your account ... and (iii) any other charges to your account provided for by this Agreement, shall be payable by us to you on a weekly basis on the Wednesday next following the week of collection. Monies shall be deemed to have been collected on the date of receipt thereof by us plus five (5) days for clearing.

*Id.* at ¶ 4(b).

9. The Agreement further provided for Capital Factors to make advances against the Purchase Price in its discretion:

> In our sole discretion, we may from time to time advance to you against the purchase price of Receivables payable by us hereunder sums up to eighty-five percent (85%) of the aggregate purchase price of Receivables outstanding at the time any such advance is made.

*Id.* at ¶ 4(d). General Plastics was obligated to pay interest on these advances at "a floating rate that at all times shall be two percent (2%) above the rate of interest designated by Capital Bank, Miami, FL as its 'Prime Rate' or 'Base Rate'...." *Id.* at ¶ 4(e).

10. The meaning of "advance rate" (a colloquial expression used by the parties in connection with the rate of advances under ¶ 4(d)) and "reserves" (referred to in ¶ 4(b)) [1] were defined by the evidence. The "advance rate" is the amount of money advanced to General Plastics as expressed by a percentage of the receivables assigned to Capital Factors. The "reserves" are the remaining receivables held by Capital Fac-

tors. For example, if General Plastics has assigned $100 of receivables, and Capital Factors has advanced $85 prior to collecting any of that $100 from General Plastics' customers, then the "advance rate" would be 85%, and the "reserves" 15%.

11. The Agreement contained several provisions designed to guarantee the integrity of the receivables assigned to Capital Factors. Paragraph 1 provides that,

> Upon each sale of goods ..., you shall execute and deliver to us such further and confirmatory assignments of your Receivables as we require, in form and manner satisfactory to us, together with copies of invoices and all shipping and delivery receipts and such other proof of sale and delivery of performance as we from time to time may require ...

*Id.* Furthermore, General Plastics warranted to Capital Factors that, "each Receivable is a bona fide existing obligation created by the sale and actual delivery of goods ... to customers in the ordinary course of business...." *Id.* at ¶ 7.

12. General Plastics also granted Capital Factors a first priority security interest in its accounts receivable. *Id.* at ¶ 8. In order to accomplish this, First Union agreed to assign its lien on the accounts receivable to Capital Factors. General Plastics Ex. 5A.

13. While Capital Factors provided several other services to General Plastics in the form of bookkeeping and receivables collection, the primary purpose for the factoring relationship was the advances made by Capital Factors on the assigned receivables. The provisions designed to guarantee that assigned invoices represent bona fide receivables would have been meaningless without any advances. Without advances, Capital Factors would only be obligated to pay the "purchase price" which was only due after the customer had paid the invoice and its check had cleared. Under the Agreement, Capital Factors would not be exposed to any risk since it would not have

---

1. See Findings Nos. 8 and 9 for text.

to pay General Plastics on invoices before it was paid on those invoices. In the absence of advances, Capital Factors could not lose anything other than minor administrative expenses and its factoring commission if the invoice turned out to be a sham and nothing was ever paid on it for any reason. Thus, unless it made advances, Capital Factors had no significant interest in whether the receivables were bona fide because the purchase price was not due until after the invoices were paid.

14. This is also clear from the provision for "reserves". Reserves protected Capital Factors against the chance that General Plastics' receivables become uncollectible. The uncollectibility of receivables could only be a risk for Capital Factors if it had advanced funds. The concept of "reserves" would be meaningless if there were no advances.

15. Further, the first priority security interest held by Capital Factors would also be meaningless in the absence of advances. The security interest was additional protection for the repayment of any advances. Without advances, the security interest served no purpose.

16. However, while advances were a necessary and integral component of this factoring relationship, it is equally clear that Capital Factors was not obligated under the Agreement to maintain an 85% advance rate. Twice in the Agreement, Capital Factors expressly retained the right to adjust the advance rate and the reserve "in our sole discretion". General Plastics, Ex. 3 at ¶ 4(b) and (d). Capital Factors undertook only that "we *may* from time to time advance to you ... sums *up to* " 85% of the Purchase Price. *Id.* at ¶ 4(d) (emphasis added). The liberal use of discretionary language in the Agreement made clear that Capital Factors could lower the advance rate if it so desired.

17. Capital Factors thus had discretion to lower the advance rate below 85%. It could even stop making advances for a short period of time. However, a permanent cessation of advances would amount to termination of the Agreement because a necessary and integral component of the factoring relationship would be removed.

## A. Assignment of Invoices to Capital Factors

18. The assignment and advances were accomplished through several steps. First, General Plastics created documents to track shipments and accounts receivable. When a purchase order was received, a General Plastics employee would create a packing slip to indicate what products were going to the customer, and a delivery manifest to indicate which orders were being delivered on any particular delivery truck. When a shipment was by common carrier, a bill of lading was produced. An invoice was also created to bill the customers for the shipped products. Each invoice contained a statement that customers were to remit payments directly to Capital Factors. *See, e.g.,* Capital Factors Ex. 134 (sample invoices, packing slips, and bills of lading). The bill of lading, combined with the terms of the invoice, had the effect of shifting the risk of loss during shipment from General Plastics to its customers.

19. Next, a General Plastics employee would complete a "Schedule of Assigned Accounts", attached to which were copies of all invoices and corresponding bills of lading created for a certain period of time. These schedules and the attached documents would then be sent to Capital Factors.

20. General Plastics did not ship every order by common carrier. Some items were shipped to customers via General Plastics' own delivery trucks. In those cases, risk of loss would not shift to the customer until the delivery was completed.

21. Under the Agreement, Capital Factors was to be protected by receiving only bona fide receivables from General Plastics, i.e. invoices which represented customer obligations to pay. The invoices for shipped goods could only represent bona fide receivables if risk of loss concerning shipments had shifted to the customers.

Therefore, assigned invoices had to be accompanied by common carriers' bills of lading. In the case of products shipped on General Plastics' trucks, Capital Factors was to receive proof that the products had actually been delivered. However, it made an exception for shipments made within the state of Florida; in those cases, Capital Factors would accept assignments and make advances without receiving proof of delivery. The reason for this exception was the short time that it usually took to complete intrastate shipments. By the time that Capital Factors received the assigned invoices (typically one day after the Schedules of Assigned Accounts were mailed out by General Plastics), the deliveries to Florida customers were generally completed.

### B. Definition and Effect of Pre-Billing

22. "Pre-billing" is a term that describes the act of assigning invoices to a factor before those invoices have ripened into bona fide receivables. In other words, pre-billing occurs when invoices are assigned to the factor before the goods are physically received by the buying customer or before the risk of loss during shipment has shifted from the factor's client to the buying customer.

23. Pre-billing would constitute a material breach of the Agreement because a pre-billed invoice did not represent a "bona fide existing obligation created by the sale and actual delivery of goods" as was required by ¶ 7. See General Plastics Ex. 3. General Plastics would be pre-billing if it used its own trucks to deliver goods to out-of-state customers and then assigned the corresponding invoices to Capital Factors prior to receiving proof of actual delivery.

24. Moreover, contrary to General Plastics' arguments, pre-billing continued to be a material breach of the Agreement, even if the goods were ultimately delivered to customers. This is because pre-billing would expose Capital Factors to a risk that a bona fide obligation would not be created.

If General Plastics assigned invoices to Capital Factors for shipments leaving on its own delivery trucks, and then Capital Factors advanced funds against those invoices, Capital Factors would not be holding bona fide receivables until the delivery was successfully completed. Should a delivery truck lose its load due to some calamity before the goods were received by the customer, then no obligation to pay for those goods would arise, and Capital Factors would not have any corresponding receivable to collect upon in order to recover its advances. Terms of the Agreement protected Capital Factors against this risk. The Agreement did not provide that Capital Factors was obliged to accept this risk and be protected merely against any actual losses that occur. Thus, General Plastics had no right under the Agreement to engage in pre-billing, even when a successful delivery followed the assignment of a pre-billed invoice. The General Plastics argument to the effect that no harm means no foul is not supported by Agreement terms.

### C. Advancement of Funds Against Assigned Invoices

25. Capital Factors created two records to account for its dealings with General Plastics. One such record was a cash receipts journal computed on a daily basis. This journal contained a list of all General Plastics' customers who paid Capital Factors for invoices due on any given day. The other record was a client ledger. This ledger recorded all accounts receivable assigned to Capital Factors, advances made by Capital Factors to General Plastics, and charges taken out of General Plastics' account.

26. When General Plastics assigned invoices via a Schedule of Assigned Accounts, Capital Factors would post those invoices into the client ledger, thereby increasing the total amount of accounts receivable held by it. The assigned invoices were to be posted when received by Capital Factors. The Agreement is silent on the issue of delay in posting invoices, but the primary purpose of General Plastics' fac-

toring relationship with Capital Factors—the assignment of accounts in return for the advancement of funds—would be jeopardized if the assigned invoices could sit unposted at Capital Factors for a long period of time. Capital Factors was obligated to post assigned invoices promptly when received.

27. Capital Factors was usually obliged to post the full amount of any invoice, but some invoices had discount terms included therein (e.g., a 1% discount when the invoice was paid within ten days of its receipt). General Plastics has argued, as to invoices with discount terms, that Capital Factors was obligated to post the full amount of the invoice and then reduce the amounts of accounts receivable by the amounts of discounts only after such discounts were actually taken. However, the Agreement clearly indicates otherwise. Paragraph 4(a) calculates the amount of "purchase price" payable to General Plastics for assigned invoices as "the invoice amount ... less ... all selling discounts ... *allowed or granted to or* taken by the customer." General Plastics Ex. 3 (emphasis added). Thus, the purchase price owed by Capital Factors was net of any discounts granted to customers, regardless of whether or not those discounts were actually taken. Capital Factors only owed the purchase price, and it only advanced funds against that amount. *Id.* at ¶ 4(d). Therefore, it had the right to post assigned invoices net of discounts granted. Capital Factors had no obligation to wait and then reduce accounts receivable only for discounts that were actually taken.

28. A further complication arose in event that the discount was only allowed on that part of the invoice representing the sale of product and not on delivery charges contained therein. For example, General Plastics sometimes sent invoices that included an 8% delivery charge, and a 1 or 2% discount. However, that discount applied only to the charge for product and not the gross invoice amount.

29. Capital Factors was never authorized to reduce its posting by more than the actual discount offered by General Plastics. However, Capital Factors conceded, in a memo to their files dated April 25, 1989, that it was calculating discounts only on the gross rather than net invoice amounts. General Plastics Ex. 53. This error caused Capital Factors not to post part of some assigned invoices that it was obliged to post. There is no evidence that Capital Factors ever rectified this error by compensating General Plastics in any way. However, General Plastics has not pointed to any specific instance where Capital Factors thereby accounted incorrectly for discounts after April 25, 1989.

30. The concern over timing of posting invoices and the method of accounting for discounts was relevant due to the next step in the factoring process. After the assigned invoices were posted, Capital Factors was obligated to make advances promptly to General Plastics' bank account via check or wire transfer. The advances could be made up to the advance rate. If a $100 invoice was assigned and posted, and the advance rate was 85%, then Capital Factors was to advance $85 to General Plastics. Thus, the method of accounting for discounts, as well as the speed by which assigned invoices were posted into Capital Factors' client ledger, could affect the timing of advances by affecting the amount of accounts receivable outstanding on any particular day.

31. At the same time that funds were advanced, Capital Factors would also be maintaining a "reserve" account consisting of the amount of outstanding accounts receivable on which no advances were made. Taking the example discussed earlier, when the $100 invoice was assigned and $85 was advanced, $15 was credited to the reserve account. This was not a cash account. The reserve was merely an accounting device to maintain a cushion that protected the factor against the possibility that some accounts receivable would be uncollectible.

32. As more invoices were assigned, the total amount of outstanding accounts receivable increased. Consequently, the amount advanced as well as the reserve accounts rose in accordance with the advance rate. Continuing the example, when a second $100 invoice was assigned, an additional $85 was advanced, bringing the total amount advanced to $170, and the reserve account rose to $30.

33. The payment of an invoice by a General Plastics customer was applied to repay the earlier advance. Contrary to General Plastics' assertion, such payments were not to be transferred through a "purchase price" payment so long as there was a continuous stream of incoming assignments and remittances thereon. Section 4(b) of the Agreement provided that purchase price was to be paid net of "monies ... advanced by us to you".

34. However, whether remittances were accounted for by purchase price payments or by reduction of outstanding advances made no difference in the day-to-day affairs of General Plastics. To illustrate this point, the example above is again continued. When the General Plastics customer with the first assigned invoice paid the $100 due, Capital Factors reduced both the amount of outstanding accounts receivable and the amount of outstanding advances by $100. This had the effect of leaving $100 of outstanding accounts receivable, but only $70 of outstanding advances. With the amount advanced now below the approved level of 85%, Capital Factors would advance an additional $15. Thus, General Plastics would have received the full $100 of its invoice, with $85 coming through the initial advance and $15 coming through a later advance made when the payment is received. Of course, once the full amount of the invoice was paid to General Plastics, nothing more was owed on the purchase price.[2]

35. This practice was to be carried out with the amounts of reserves, advances, and outstanding accounts receivable being adjusted on a daily basis to reflect the continuous stream of outgoing advances and incoming invoices and remittances. Such adjustments were consistent with both the terms of the Agreement and general practice in the factoring industry.

36. General Plastics argued that Capital Factors violated the Agreement by not promptly posting the assigned invoices or the payments received from General Plastics customers. If true, this behavior would have the effect of delaying advances and hindering General Plastics' cash flows. However, the weight of evidence did not support this assertion. Furthermore, even if there were delays in posting, Capital Factors consistently followed a practice of advancing funds against invoices and crediting payments against outstanding advances on the day that such invoices and payments were received rather than waiting for posting to occur. Thus, there is no merit to General Plastics' arguments that Capital Factors improperly posted payments. The evidence did not establish that argument, and Capital Factors acted in a way that avoided any harm to General Plastics in the event that delays in posting did occur.

D. Computing Interest Charges and Factoring Commissions

37. Capital Factors had the right to charge interest on its advances at "a floating rate that at all times shall be [2%] above the rate designated by Capital Bank ... as its 'Prime Rate'". General Plastics Ex. 3 at ¶ 4(e). Both parties agreed that interest calculations had to be based on annual interest rates. Further, there was nothing in the Agreement to indicate that Capital Factors could calculate daily interest charges by dividing that annual interest rate by 360 rather than 365, the number of

2. This example does not account for interest charges and factoring commissions, which are discussed below.

actual days in the year. Charging 365 days' worth of interest based on the annual rate divided by 360 would result in a rate that is .014%[3] higher than the interest rate designated in the Agreement. The weight of evidence did not establish either that such a practice is the norm among factors, or that the Agreement could reasonably be construed to allow interest charges based on a 360–day year. The Agreement itself did not by its terms permit that practice.

38. A further complication arose from Capital Bank's definition of "Prime Rate" which applied under the Agreement. Periodically, Capital Bank would send Capital Factors a memo concerning changes in the Prime Rate. However, these memos stated that the effective date of the change was different for new and renewed loans than for other loans. *See* General Plastics Ex. 222A ("Effective today, Monday, February 4, 1991, the prime rate for all new and renewed loans is 9.5%. For all other loans, the rate change is effective March 1, 1991"). Whether Capital Factors' advances to General Plastics constituted new or existing loans was not defined. On the one hand, new advances were made based on a constant stream of incoming payments and invoices, and each advance was a new loan. On the other hand, prior advances were outstanding at the time of each interest rate memo. Since the Agreement was drafted by Capital Factors, if this were viewed as an ambiguity, it should be construed in General Plastics' favor. Moreover, the thrust of the Agreement was for interest to accrue from the advance date. Thus, Capital Factors was obliged under the Agreement to change the interest rate charged on advances on the effective date for new loans, that is the date on which new rates were announced. During a period of falling interest rates, the earlier date benefited General Plastics.

39. General Plastics proved at trial that Capital Factors calculated interest by dividing the annual rate by 360 rather than 365.

Furthermore, Capital Bank changed its Prime Rate several times from 1986 to 1991, yet Capital Factors only changed its interest rate for General Plastics on the later effective date for rate changes on existing loans, not on the earlier effective date for new loans.

40. In addition to interest, Capital Factors was entitled to charge a factoring commission on each assigned invoice. This commission consisted of .5% of each "net invoice amount". *See* Findings, *supra*, ¶ 7 (defining this term). Capital Factors would also charge an additional surcharge equal to 25% of the normal commission whenever General Plastics allowed customers to pay the net amount of their invoices more than 30 days after the date of the invoice. General Plastics Ex. 3, ¶ 5.

41. General Plastics argued that Capital Factors overcharged it for factoring commissions by calculating the commissions based on the gross invoice amount rather than the "net invoice amount". In other words, Capital Factors was charging its .5% commission on the discounts offered to General Plastics' customers despite the fact that, under ¶ 4(a) of the Agreement, these discounts were not posted as part of the assigned invoices. *See* Findings, *supra*, ¶ 27. Capital Factors does not contest this point for commission ·charges made prior to the Agreement amendment executed on June 1, 1988 (discussed more fully at ¶¶ 50–55). It argued, however, that the 1988 amendment allowed it to calculate its factoring commissions based on the gross amount of the invoice, rather than the "net invoice amount".

42. Paragraph 2 of the 1988 amendment stated, in relevant part:

Paragraph 5(a) of the [original] Agreement ... is hereby deleted in its entirety and a new paragraph 5(a) is hereby added to read as follows:

For our services hereunder, [General Plastics] shall pay and [Capital Factors]

---

3.
$$\frac{365}{360} = 1.014$$

shall be entitled to receive a Factoring Commission equal to [1%] of the Invoice Amount of each Receivable....

General Plastics Ex. 31. (Bracketed parts inserted.) This amendment allowed Capital Factors to calculate commissions based on the "Invoice Amount" rather than the "net invoice amount" (a term defined in ¶ 4(a) of the original Agreement). Contrary to General Plastics' argument, the "Invoice Amount" is not naturally and reasonably the same thing as "net invoice amount". The term "Invoice Amount" can only mean the whole amount of the invoice rather than the invoice net of discounts (the latter being the definition of "net invoice amount"). Therefore, after the effective date of the 1988 amendment, Capital Factors was no longer obliged to calculate commissions based on the amount of invoices net of discounts.

43. Mr. William Finn, an assistant to General Plastics' president, testified that, by his calculations, Capital Factors was generally overcharging on commissions. However, this testimony was not supported by any specific calculations based on actual numbers in the client ledgers or other documents. On the other hand, Mr. Scott Mac-Millan, the executive at Capital Factors responsible for managing General Plastics' account, reviewed a client ledger while on the stand and convincingly demonstrated to the Court that commissions were indeed calculated according to the rates set out in the Agreement (and the amendments thereto). *See* Capital Factors Ex. 165. Thus, General Plastics has not proven by a preponderance of evidence that Capital Factors was generally overcharging factoring commissions.

### E. Summary

44. Capital Factors was in substantial compliance with the Agreement and the amendments thereto (these amendments being discussed *infra*) with respect to (i) its methods and timing in posting assigned invoices and remittances thereon, (ii) its method and timing in advancing funds to General Plastics, and (iii) its method of calculating and charging for factoring commissions after June 1, 1988. The only areas in which Capital Factors breached the Agreement were in (i) its calculation of factoring commissions prior to June 1, 1988, (ii) its method of calculating daily interest charges, (iii) its timing in applying new interest rates, and (iv) its posting of customer discounts when shipping charges were not included in the discount.

45. These violations were technical in nature and relatively minor in their effect. While redress must be afforded for those violations, they are not indicative of bad faith on the part of Capital Factors.

### III. *Relevant Events From April 1986 through June 1990*

### A. Advances Starting in 1986 and Discovery of Pre-Billing in 1987

46. The factoring relationship between the parties commenced in April 1986, when Capital Factors funded $818,000 on General Plastics' behalf to satisfy General Plastics' delinquent tax obligation to the IRS. From that time until June of 1990, General Plastics assigned its invoices to Capital Factors, and Capital Factors advanced funds at an 85% advance rate.

47. The first major problem arose between General Plastics and Capital Factors in April of 1987. For some time before then, General Plastics was pre-billing. *See* Capital Factors Ex. 82, and General Plastics Ex. 12. It was also directing some of its customers to send their remittances directly to General Plastics despite having already assigned the invoices related thereto. General Plastics' behavior constituted a material breach of the Agreement. However, despite learning of these practices, Capital Factors did not terminate their relationship or reduce the advance rate at that time.

48. The reason for Capital Factors' forbearance in 1987 was the change in General Plastics' management. Mr. Robert Bumgarner, who was formerly with General Plastics from the mid–1960s to 1982, returned to General Plastics as its president

in late April 1987. Capital Factors was then assured specifically by Mr. Bumgarner that he would put an end to the pre-billing and direct payments, and General Plastics did indeed rectify those problems during late April and May of 1987. General Plastics Exs. 14 and 15.

49. General Plastics argued at trial that it was entitled to expect from this act of forbearance in 1987 that Capital Factors would continue to lend against assigned invoices at an 85% advance rate, regardless of changing circumstances in the future. There is no merit to·this argument. Capital Factors never agreed that it would always continue to advance funds in the face of renewed pre-billing. Instead, Capital Factors warned General Plastics that such behavior would not be tolerated in the future. Capital Factors Ex. 82. Capital Factors clearly did not acquiesce to allowing pre-billing or other such fraudulent behavior, and General Plastics had no right to expect that it would do so in the future. The Agreement terms prohibiting such practices remained in effect and were not modified by Capital Factors' conduct.

### B. The 1988 Amendment to the Agreement

50. In 1988, as earlier discussed, the parties amended the Agreement. Two changes were then made. First, the factoring commission rate was changed from .5% of the net invoice amount to 1% of the invoice amount. Second, the termination clause of the Agreement was modified.

51. The original Agreement provided for a method of termination in ¶ 9, stating:

> This Agreement shall continue in full force and effect for a period of one year from the date hereof, and shall be deemed renewed from year to year thereafter unless you [General Plastics] give us [Capital Factors] notice in writing ... not less than sixty (60) and not more than ninety (90) days prior to the expiration of the original term of this Agreement (or any renewal term thereof), of your intention to terminate this Agree-

ment at the end of such term. We [Capital Factors] may terminate this Agreement at any time upon thirty (30) days prior written notice to you [General Plastics]. Notwithstanding the foregoing, if you ... breach or become in default under this Agreement or any other agreement with us or any of our affiliates or any Obligation to us ..., then, notwithstanding the foregoing, we shall have the right to terminate this Agreement at any time without notice ...

General Plastics Ex. 3. (Inserts supplied.) The 1988 amendment changed and restated ¶ 9 to provide that:

> This Agreement shall continue in full force and effect unless you [General Plastics] give us notice in writing, by registered or certified mail, at least 60 days prior to the date you wish to terminate. We may terminate this Agreement at any time upon thirty (30) days' prior written notice to you. Notwithstanding the foregoing, if you ... breach or become in default under this Agreement or any other agreement with us or any of our affiliates or any Obligation to us ..., then, notwithstanding the foregoing, we shall have the right to terminate this Agreement at any time without notice ...

General Plastics Ex. 31.

52. Whereas under the original Agreement, General Plastics could only terminate the relationship upon notice given sixty days prior to the annual renewal date for the Agreement, the amended Agreement gave General Plastics the right to terminate at any time so long as it gave sixty days' prior notice. Thus, the 1988 amendment expanded General Plastics' right to terminate the Agreement. That change was in accord with a request from Mr. Bumgarner. However, the old language of the former § 9 was retained to continue Capital Factor's right to terminate without notice in event of breach or default.

53. Following the paragraph containing the restated ¶ 9, the 1988 amendment contained another paragraph which stated:

*This* Agreement is to continue in full force and effect until written notice of termination is served by any one of the parties hereto on the others.... *The* Agreement is hereby confirmed and ratified.

(Emphasis supplied.) General Plastics Ex. 31. Contrary to General Plastics' arguments at trial, this added paragraph by its terms did not modify the new termination clause, not did its location in the document do so by inference. Moreover, the latter provision did not modify or extinguish Capital Factors' right to terminate "without notice" if General Plastics breached the Agreement. It merely placed a termination condition on the amendment agreement; i.e. the amendment would remain in full force and effect until either party served notice to terminate it. This result is apparent for several reasons. First, in the first Recital to the amendment, the original Agreement was defined as "the Agreement", yet the amendment paragraph now under discussion distinguishes between "this Agreement" and "the Agreement". Thus, the term "this Agreement" referred to the amendment and not to the original Agreement. Second, whereas the paragraphs modifying ¶ 5(a) (setting the new factoring commission) and ¶ 9 begin with the clause, "paragraph [5(a) or 9] of the Agreement ... is hereby deleted in its entirety and a new paragraph [5(a) or 9] is hereby added to read as follows", this paragraph merely starts with "This Agreement is to continue ..." *Id.*

54. These facts indicate that the paragraph in question was not meant to modify the termination clause of the original Agreement. Rather, it was only meant to apply to the amendment. This interpretation is the only one that can harmonize this paragraph with the earlier paragraph containing the restated ¶ 9. Otherwise, interpreting this paragraph to modify the termination clause (¶ 9) would contradict and render meaningless the restated ¶ 9 that was laid out in the amendment. It would further ignore the clearly different use of words in the text of the amendment. This

paragraph protected General Plastics from further rate change without notice, but did not change the restated paragraph as to termination of the entire Agreement.

55. This paragraph is not found to be ambiguous. However, should it be read to introduce ambiguity into the 1988 amendment, then testimony of Mr. Bumgarner (who signed the amendment on behalf of General Plastics) disproved General Plastics' reading. Mr. Bumgarner testified that the expansion of General Plastics' power of termination was *quid pro quo* for the increase in factoring commissions. *See also* General Plastics Ex. 27 (Memo to Capital Factors' file stating that "[Bumgarner] tentatively agreed to the increase in commission rate from .50 to 1% on General Plastics.... *The sole proviso* is that he wanted the right to terminate at any time by giving us 60 days prior written notice" (emphasis added)). The weight of evidence did not establish negotiation or discussion about diminishing Capital Factors' powers of termination. Thus, the amendment was merely intended to change the factoring commission rate and General Plastics' termination rights; no change in Capital Factors' termination rights was intended or drafted. If this paragraph was intended to alter or affect the previous paragraph restating Agreement ¶ 9, then Capital Factors would have lost the right to terminate without formal notice in event of a material breach. Such a serious consequence cannot be read into the document in absence of clear language to that effect. Since this result was not negotiated for or intended by the parties, it will not be read into the amendment when a reading congruent with negotiations of the parties is clearly evident.

### C. Capital Factors' June 1990 Reduction in the Advance Rate from 85% to 70%

56. After the 1988 amendment, Capital Factors continued for a time to advance funds against assigned invoices at an 85% advance rate. However, Capital Factors

reduced its advance rate for General Plastics to 70% on June 11, 1990.

57. General Plastics argued that Capital Factors breached the Agreement by permanently refusing to advance funds up to an 85% advance rate. However, as discussed above, Capital Factors had the right under the Agreement to reduce the rate from 85 to 70% since the advance rate was set at Capital Factors' sole discretion.

58. Furthermore, Capital Factors had ample justification for reducing the advance rate, and acted in good faith when it did so. The reasons then given by Capital Factors for this reduction were:

1) Volume of General Plastics was off and sizeable losses were being sustained. Losses should be funded by stockholders, not by the factor.

2) Capital Factors had received inadequate financial reporting.

3) It was also concerned about the client's internal controls, which were not adequate to prevent retention of direct payments, duplicate billings, and other billing errors.

4) There were continuing tax liens being imposed.

General Plastics Ex. 85.

59. These stated reasons were amply supported by evidence presented at trial. For example, in February of 1990, Capital Factors discovered that the IRS had placed a federal tax lien on General Plastics' property in the approximate amount of $438,-000. General Plastics Ex. 72. This lien was then paid off by funds accumulated at Capital Factors. General Plastics Exs. 73–74. However, a new federal tax lien was imposed in April of 1990 in the approximate amount of $339,000. General Plastics Ex. 76. Again, this debt was paid by funds accumulated at Capital Factors. Then, in May of 1990, General Plastics warned Capital Factors that yet another federal tax lien

could be expected in June.[4] General Plastics Ex. 83.

60. Further, there were indeed continuing business losses at General Plastics without new capital infusion from its stockholder. Mr. Bumgarner told Capital Factors that General Plastics needed about $1,700,000 in monthly sales to break even. General Plastics Ex. 76. However, sales for April of 1990 were projected to reach only $1,100,000. General Plastics Ex. 82. Moreover, Capital Factors could not be entirely confident of these figures because of a lack of solid financial reporting from General Plastics. *See* General Plastics Ex. 84 (discussing the need for tighter control over the assignment process as well as the lack of financial statements for April 1990).

61. These events followed a history of losses by General Plastics throughout much of 1988 and 1989. Indeed, Capital Factors received some pressure from state banking examiners who made special mention of the General Plastics account when they reviewed Capital Factors' portfolio. General Plastics Ex. 62. The reason for this special mention was General Plastics' continuing losses. *Id.*

62. General Plastics argues that the June 11, 1990 reduction of advance rate from 85% to 70% was made in bad faith because its accounts receivable continued to be collected at the same high rate throughout 1989 and 1990. While that collection history was indeed positive, General Plastics' overall business appeared, from Capital Factors' point of view, to be declining steadily. The evidence demonstrated that, when a business fails, its factor becomes more dependent on receivables to pay off advances made. Receivables of a failing business generally have a tendency to become less collectible, particularly if that business stops operating. Therefore, the overall collection record on General Plastics' receivables was only one fact for Capital Factors to consider when it as-

---

**4.** Such a lien was, in fact, issued and then paid for by a check sent directly from Capital Factors

to the IRS. General Plastics Ex. 114.

sessed its risks on the General Plastics' account. Other facts, including continuing business losses, indicated that Capital Factors was exposed to an increased risk of nonpayment in June of 1990. Therefore, Capital Factors acted in good faith when it lowered the advance rate at that time.

63. General Plastics further relies on an internal memorandum sent by Mr. MacMillan (the vice-president in charge of General Plastics' account) to Mr. Herzog (the account manager administering General Plastics' account). In that memo, Mr. MacMillan stated, "[i]f the client wishes its advance rate to remain at 85%, we will require outside 'hard' collateral equivalent to 15% of the outstanding receivables." General Plastics Ex. 85. There was no evidence that such a proposal was ever made to General Plastics when it was told that the advance rate would be lowered. See General Plastics Ex. 84 (Memo from Mr. Herzog to file noting the conversation between him and Mr. Finn at General Plastics concerning the advance rate).

64. Capital Factors' failure to transmit such an offer is not an indication of bad faith. First, General Plastics had no contractual right to prevent a reduction in its advance rate by offering additional collateral. Second, General Plastics' other assets were already encumbered by First Union's Lien. Since Capital Factors had discretion to lower the advance rate, it necessarily had the discretion to withhold any additional offers to maintain the current rate. In light of General Plastics' uncertain financial status in June of 1990, Capital Factors was certainly justified in not offering any deal to maintain the 85% advance rate. Moreover, this argument by General Plastics is disingenuous as it did not demonstrate at trial any capability to post outside collateral nor did it offer or indicate any willingness to do so.

## IV. Relevant Events from June 1990 to March 1991

### A. General Plastics' Shipments Via Its Own Trucks

65. In June and July of 1990, Capital Factors began to require that General Plastics transmit signed delivery receipts to it when General Plastics used its own trucks to deliver goods to out-of-state customers. Moreover, Capital Factors would not advance funds against assigned invoices until such delivery receipts were transmitted. This requirement did not apply to shipments made via common carriers or to intrastate Florida shipments made on General Plastics' trucks.

66. As discussed above, see Findings, supra, ¶¶ 20–21, this requirement was consistent with the Agreement as it ensured that Capital Factors would only be making advances against bona fide receivables.

### B. General Plastics' Continuing Losses

67. From June through November of 1990, General Plastics continued to lose money on its operations. General Plastics Exs. 101 and 105. Although General Plastics' executives remained optimistic about business prospects, Capital Factors' representatives were becoming increasingly nervous about this factoring relationship. Indeed, Mr. Herzog stated in a memo to Mr. MacMillan that, "if it were not for the collateral continuing to perform well [i.e. the receivables continued to be collectable] and the verifications coming back clean I would recommend we consider terminating this client immediately." General Plastics Ex. 101.[5] Also, the minutes of a meeting held on December 7, 1990 by Capital Factors' board of directors contain this summary of the Board's discussion of General Plastics: "We need to increase our factoring commission and consider a further reduction in our advance rate (from 70%) if the client does not provide credible financial statements and demonstrate that the

---

5. The term, "verification" refers to a process by which Capital Factors employees would select a sample of assigned invoices and then verify that they represent bona fide receivables.

company has a new direction." General Plastics Ex. 108.

68. One other consideration was also apparent. There was no evidence to demonstrate the financial support of General Plastics by its sole shareholder Arthur Knutson at any time during 1990. Mr. Finn indicated that one of the major reasons for General Plastics' continuing losses was a loss of sales volume and tight cash flows. General Plastics Exs. 103 and 105. The company was hampered by high overhead because it was only able to run its Florida plant at about 50% of capacity. These problems might have been alleviated through an infusion of capital from its shareholder. Such capital might have allowed the company to increase both capacity and sales, thereby freeing it from having a chronic shortage of cash. However, Mr. Knutson never made such a capital infusion at this critical time. Instead, there was talk of Mr. Bumgarner acquiring General Plastics if it ever became profitable. General Plastics Ex. 106. In light of the sole shareholder's apparent lack of confidence in General Plastics, it is certainly understandable that Capital Factors would also lose confidence.

## C. The January 1991 Amendment to the Agreement

69. In December of 1990, General Plastics was informed of Capital Factors' desire to increase the factoring commission from 1% to 1.25%. The reason for this increase was to compensate Capital Factors for continuing its factoring relationship in the face of its increasing lack of confidence in General Plastics. The increase was also meant to pay for Capital Factors' stepped up monitoring of General Plastics. General Plastics Ex. 110. General Plastics was also informed in December of Capital Factors' demand for timely financial statements that were reliable and prepared in accordance with generally accepted accounting principles. *Id.*

70. Pursuant to Capital Factors' requirement, the Agreement was amended so that the factoring commission was increased to 1.25% effective January 1, 1991. The written amendment was drafted by Mr. Herzog who used the 1988 amendment as his model. Like the 1988 amendment, this document also contains the paragraph stating,

This Agreement is to continue in full force and effect until written notice of termination is served by any one of the parties hereto on the others.... The Agreement is hereby confirmed and ratified.

General Plastics Ex. 111. The textual analysis of this paragraph in the 1988 amendment (Findings Nos. 53 and 54) applies with equal force to this paragraph in the 1991 amendment. It cannot be reasonably construed as affecting the termination clause (¶ 9) of the Agreement, as amended in 1988.

71. Once again, even if this paragraph were read to introduce ambiguity into the document, it is clear from discussions surrounding the amendment that neither party intended it to affect termination rights under the original Agreement. First, there was no evidence that anyone at General Plastics ever asked for a change in Capital Factors' termination rights when the 1991 amendment was discussed. Indeed, Mr. Bumgarner testified that Capital Factors mandated rather than asked for an increase in the factoring commission, so there was no significant discussion at all concerning this amendment. Second, it is clear from Mr. Herzog's testimony that he did not intend to affect substantive rights of termination when he added this paragraph. Indeed, he seemed to have no specific intent at all other than to change the factoring commission. Therefore, both the text and negotiations leading up to the 1991 amendment indicate that ¶ 9 of the Agreement, as it was restated in the 1988 amendment, continued to control the parties' rights to terminate the factoring relationship after January 1, 1991.

## D. Events from January to March of 1991

72. On February 12, 1991, an auditor from Capital Factors examined General

Plastics' payroll records, and determined that General Plastics owed the IRS approximately $361,000 in delinquent payroll taxes. General Plastics Ex. 119. In receiving the news, Mr. Herzog noted that "We [Capital Factors] need to ensure that we are verifying a high percentage of [General Plastics'] accounts receivable." General Plastics Ex. 118. This debt to the IRS had to be paid with funds accumulated from remittances sent to Capital Factors. General Plastics Ex. 121. There was a possibility that General Plastics' affiliate in Dallas would not be able to support General Plastics while this money was being accumulated. General Plastics Ex. 124. Capital Factors' Board of Directors indicated their concern over this IRS lien at the February 1991 meeting. General Plastics Ex. 122.

73. Also in February of 1991, Capital Factors' Board approved a cap of $1,300,000 for advances made to General Plastics. The purpose for this cap was to prevent a sudden surge in advances caused by any sudden surge in assignments. As Mr. MacMillan testified, when companies are failing they sometimes assign a higher than normal amount of invoices in order to obtain an emergency cash infusion. Should the company fail, the factor is left with a large outstanding loan and uncollectible accounts receivable. The loan cap was designed to prevent such an occurrence. As Mr. MacMillan noted, advances might still go above that cap, but board approval would be needed before that happened.

74. On March 15, 1991, the loan cap was lowered to $1 million. General Plastics Ex. 125A. Mr. MacMillan noted that this reduction "reflect[s] deterioration in the quality of [General Plastics'] credit and reaffirm[s] the need to monitor their performance very carefully." *Id.*

75. In the early part of 1991, as in 1990, Mr. Knutson did not make any fresh infusion of equity capital. By mid-March of 1991, General Plastics was continuing to operate at a loss, and Capital Factors was increasingly losing its confidence in this client.

## V. *Capital Factor's Termination of the Factoring Relationship in March 1991*

### A. Discovery of Pre–Billing on March 14

76. On March 14, 1991, an auditor from Capital Factors was verifying invoices assigned by General Plastics. One of these invoices listed a common carrier known as Florida Delivery for a shipment to a General Plastics' customer, JAD Corporation, located in College Point, New York. However, Florida Delivery told the auditor that it did not ship goods outside of the state of Florida. Moreover, JAD could not verify that any common carrier actually delivered the General Plastics product to it. Thus, it was clear that General Plastics had misrepresented information on those assigned invoices.

77. Such misrepresentations constituted a breach of ¶ 1 of the Agreement because invoices containing false information were obviously not in a "form and manner satisfactory to" Capital Factors. General Plastics Ex. 3. Moreover, the misrepresentations also constituted a breach of the warranty contained in ¶ 7 of the Agreement because the invoices were not bona fide receivables at the time they were assigned. To be bona fide, the customer had to owe General Plastics for delivered goods and the risk of loss had to be on the customer rather than General Plastics. The JAD invoices were clearly not bona fide receivables at the time they were assigned because the goods were shipped on General Plastics' trucks. If the shipments to JAD were lost or destroyed in transit, then JAD would have owed nothing, yet Capital Factors would have already added the JAD invoices to its client ledger and advanced funds thereon.

78. General Plastics argues that deceptive delivery documents based on those invoices were never received by Capital Factors prior to the completion of the shipments to JAD. However, General Plastics employees testified that all Schedules of Assigned Accounts were sent by means

that would ensure that they would be received by Capital Factors by the next morning after their delivery by Federal Express or messenger. Capital Factors would then make advances upon receipt of the Schedules. These schedules reflected or incorporated information on the bills of lading. Therefore, Capital Factors probably received and advanced funds upon the pre-billed JAD invoices.

79. General Plastics further argues that this misrepresentation was not material since the goods were actually shipped and delivered. This is a variation on the "no harm, no foul" argument sometimes heard in law as it is in sports. However, as pointed out above, Findings, *supra*, ¶¶ 21–24, these false invoices demonstrated that General Plastics was "pre-billing", thereby exposing Capital Factors to risk. It was the *risk* of non-shipment and non-payment that the Agreement was designed to prevent, and not merely actual losses incurred due to non-shipments. Thus, General Plastics' act of misrepresenting information about shippers on assigned invoices was indeed a material breach of the Agreement. This point is clear, even without knowledge at that time that the JAD invoices then discovered were, in fact, only the tip of the iceberg. (See Findings, *infra*, ¶¶ 85–86.)

80. The history of the factoring relationship must be taken into account in considering the actions taken by Capital Factors after discovery of this pre-billing. General Plastics' financial health had been deteriorating for three years, and its sole shareholder had given no financial support to the company in over a year. Capital Factors reasonably perceived that the continuation of advances to General Plastics was becoming an increasingly risky affair. This perception was further supported by views of banking regulators. In response to its growing risk, Capital Factors had earlier decreased the advance rate and increased its factoring commissions. Further, its ability to collect on advances was now heavily dependent upon the accounts receivable assigned to it. Thus, without bona fide receivables, Capital Factors would have no assets backing up its loan and an insolvent debtor to pursue. Upon learning that General Plastics was cutting corners by pre-billing, confidence in that client ended. In this context, the action then taken by Capital Factors was commercially reasonable.

## B. Suspension of Funding on March 18

81. Mr. Herzog learned of the new pre-billing practices on March 14. That same day, he met with Mr. Bumgarner and confronted him with the information. *See* Capital Factors Ex. 94 (Mr. Herzog's memo to Mr. MacMillan recalling the substance of that meeting). Mr. Bumgarner then admitted that General Plastics had created fraudulent bills of lading to falsely support shipment of goods under invoices totalling approximately $70,000. *Id.* At this meeting, it became clear that Mr. Bumgarner, the very person brought in to take control and put an end to pre-billing in 1987, had not authorized the pre-billing, had only became aware of it after the fact. This $70,-000 in pre-billed invoices constituted about 5.6% of all the General Plastics' accounts receivable then assigned to Capital Factors. *See* General Plastics Ex. 230 (Capital Factors' client ledger for March 1991).

82. Mr. MacMillan was advised of the auditor's discovery and Mr. Herzog's meeting with Mr. Bumgarner on March 18, the following Monday. Capital Factors Ex. 94. Mr. MacMillan then spoke with Mr. Bumgarner that same day. Capital Factors Ex. 85. Mr. Bumgarner admitted to him that the "pre-billing" had occurred. Mr. MacMillan informed him that Capital Factors would suspend advances temporarily until it had verified the absence of any other false invoices or bills of lading. *Id.*

83. Capital Factors suspended funding on March 18. This meant that Capital Factors stopped making any advances on newly assigned invoices. It also applied all newly received remittances to reduce the balance of outstanding advances.

84. This suspension was permitted by the Agreement as Capital Factors had the right thereunder to suspend fundings temporarily in its sole discretion. General Plastics Ex. 3; Findings, *supra*, ¶ 16. Furthermore, considering all the circumstances discussed above, the suspension could only be construed as a good faith attempt by Capital Factors to protect itself and still preserve the factoring relationship during a period of further investigation.

## C. Termination of the Agreement on March 19

85. On March 18, Capital Factors dispatched a second auditor to confirm the validity of other outstanding accounts receivable and supporting shipping documents assigned by General Plastics. That auditor looked at invoices assigned between February 20 and March 12, 1991. He discovered 40 invoices for out-of-state customers supported by bills of lading purportedly evidencing shipment via Florida Delivery, the same carrier listed on the JAD invoices. Capital Factors Ex. 86. However, Florida Delivery did not make these deliveries because it did not ship goods outside the State of Florida. These 40 invoices represented about two-thirds of all the invoices examined. Thus, the March 18 audit revealed a most significant pattern and practice of pre-billing.

86. What Capital Factors learned in its audits of March 14 and 18 was, in fact, only the tip of the iceberg. They learned the full story later and proved it at trial. In late 1990, several mid-level managers at General Plastics, including the shipping manager, sales manager, accounting manager, and Mr. Finn, held a series of meetings at which they devised a method to pre-bill their invoices systematically in order to improve General Plastics' cash flow. They never planned to assign invoices for fictitious sales. However, they specifically intended to assign invoices and receive advances from Capital Factors before those invoices would come to represent bona fide receivables.

87. The shipping manager put this plan into effect in either late 1990 or early 1991. She recruited employees from various departments to forge signatures regularly on bills of lading which would then be sent to Capital Factors along with the Schedules of Assigned Accounts. Capital Factors was unaware of this plan or of the shipping manager's activities on March 18, 1991. Indeed, it only learned the full extent of these practices during discovery for this litigation. However, the March 18th audit certainly revealed enough to cause grave doubts about the integrity of General Plastics.

88. There was no evidence that Mr. Bumgarner was aware of this plan to deceive Capital Factors when it was devised or executed. He only learned of it after Capital Factors discovered pre-billing on its own. His ignorance was no comfort to Capital Factors because he was the person who was to put an end to pre-billing in 1987, and Capital Factors relied upon him to remain in control and to prevent recurrence of this practice.

89. Based upon information revealed in the March 18 audit, Capital Factors terminated its factoring relationship with General Plastics on March 19, 1991. Mr. MacMillan spoke with Mr. Bumgarner that day and told him that Capital Factors would not advance any more funds to General Plastics until the advances outstanding were completely repaid.

90. Mr. MacMillan then sent Mr. Bumgarner a letter in which he stated that, "Capital Factors has elected to discontinue advancing funds to General Plastics prior to collection of assigned invoices and to withhold all further advances until we are in a collected funds position." Capital Factors Ex. 4. "Collected funds position" meant that the amount of the reserve would equal or exceed the total outstanding accounts receivable balance. In other words, the advances would be fully repaid. The principal reason given for this decision was the discovery of forged bills of lading. *Id.* However, Capital Factors also justified

its decision by pointing out General Plastics' failure to pay payroll taxes when due, inaccuracies in its financial statements submitted to Capital Factors, and questions concerning the solvency of General Plastics. *Id.*

91. Capital Factors argues that its decision to stop making advances on assigned invoices did not constitute a termination of the Agreement. However, as discussed above, Findings, *supra*, ¶¶ 13–15, 17, Capital Factors thereby ended the central characteristic of its contractual relationship with General Plastics. Thus, by putting an end to making advances, Capital Factors terminated the Agreement, even though it never called it a termination.

92. It could be said that, after March 19, a new and more limited factoring relationship was formed, but it is more accurate to find that Capital Factors exercised its contractual rights under the Agreement post-termination. In this period, Capital Factors provided bookkeeping and collection services to General Plastics in return for payment of the factoring commission. In this sense, Capital Factors is correct in saying that it did not sever all relations with General Plastics after it stopped making advances. However, it cannot be said that the Agreement signed in 1986 and amended in 1988 and 1991 was still fully in effect after March 19 because advances were such an integral part thereof.

93. However, Capital Factors did not violate the Agreement when it effectively terminated it. Paragraph 9 of the Agreement (as restated in the 1988 amendment) provided that, "if you ... breach or become in default under this Agreement or any other agreement with us ..., then ... we shall have the right to terminate this Agreement at any time without notice...." General Plastics Ex. 31. General Plastics clearly breached the Agreement by assigning forged bills of lading to Capital Factors in order to accelerate advances. Capital Factors therefore had the right, under ¶ 9, to terminate without notice, although it did

in fact give written notice of an end to advances. Capital Factors Ex. 4.

94. Furthermore, considering the financial condition of General Plastics and the fact that a large proportion of assigned invoices contained fraudulent misrepresentations, Capital Factors was clearly justified in terminating, and cannot be said to have acted in bad faith.

95. Capital Factors did send out a letter dated March 26, 1991 to all General Plastics customers who had outstanding accounts receivable that stated, "Please let this letter serve to confirm our continuing factoring arrangement with General Plastics Corporation. All checks ... should be made payable to Capital Factors...." General Plastics Ex. 133. While the statement that Capital Factors had a "continuing factoring arrangement" with General Plastics did not describe the limitations of that "arrangement", this letter is not sufficient to prove bad faith. Capital Factors did have a contractual right to collect on assigned receivables even after termination of the Agreement, at least until its advances were fully repaid. Thus, Capital Factors had a right to protect its interest and could act to ensure the collection of these receivables. The letter to customers served that purpose.

96. General Plastics further supports its claim of bad faith by pointing to minutes of the regular monthly meeting held by the Capital Factors Board on March 20, 1991. Those minutes state that, "Our current loan [to General Plastics] ... is approximately $600,000 against receivables of $1.1 million. We anticipate no difficulty collecting out of this account." General Plastics Ex. 129. General Plastics' receivables had always been highly collectable. From 1986 to 1991, General Plastics had assigned about $80 million of receivables, and all but an insignificant portion of these receivables were paid on a current or near-current basis.

97. However, the confidence that Capital Factors' Board had in collectibility of General Plastics' receivables on March 20

did not relieve its concern over discovering a significant pattern of pre-billing, nor change its perception that General Plastics was a failing business. Moreover, as discussed below, General Plastics shut down operations on March 20, and there is no indication that Capital Factors' Board was aware of this fact when it met and discussed the General Plastics' account that same day. Perhaps the directors' opinion about receivables would have changed had they known of the closing. This comment, even when considered with the letter to General Plastics' customers, is clearly insufficient to warrant a finding of bad faith.

## VI. *Post–Termination Events*

### A. The Contractual Relationship Ends in April 1991

98. General Plastics continued to assign its invoices after the termination of advances, and Capital Factors continued to receive those assignments. The factor also accounted for and collected on all assigned receivables in its possession. Indeed, General Plastics had a definite need at that time for Capital Factors' bookkeeping and collection services because it was forced to shut down all operations and lay off its employees on March 20, 1991. The advances from Capital Factors were General Plastics' sole source of operating cash, and no other source of funding was obtained when those advances were discontinued.

99. General Plastics made its last assignment on April 9 or 10, 1991. By then, what was left of the factoring relationship was ended. After termination, however, Capital Factors had a continuing contractual obligation and right to collect receivables until its loan was completely repaid. When that happened, it was to pay the purchase price to General Plastics for all receivables (and any proceeds thereof) still in its possession or else return those receivables.

100. In a conversation with Mr. Bumgarner on March 19, Mr. Herzog said that Capital Factors would consider advancing funds again after the current loan balance was completely repaid. General Plastics Ex. 128 (Mr. Herzog's March 19th note to file). However, advances were never restarted. By April, General Plastics' plant had been moth-balled and other creditors of General Plastics had approached Capital Factors about taking the receivables still in its possession.

101. On April 9, 1991, Capital Factors' client ledger indicated that the outstanding loan balance was completely repaid and a credit balance was starting to grow. General Plastics Ex. 223. However, the Agreement allowed for five clearance days in calculating when a payment had been received. *See* General Plastics Ex. 3, ¶ 4(b) ("Monies shall be deemed collected on the date of receipt thereof by us plus five (5) days for clearing"). Since the ledger changed balances on the date of receipt rather than the date of clearance, it prematurely showed a "collected funds" position. Capital Factors actually came into a "collected funds" position on Monday, April 15, 1991.

### B. General Plastics' Creditors Make Competing Claims Against General Plastics' Receivables after March 19

102. General Plastics argues that Capital Factors was obliged to return all receivables and the proceeds thereof after its loan was repaid. However, such a return was not made at that time. Therefore, General Plastics argues that Capital Factors converted its receivables. This argument fails because several other creditors of General Plastics had asserted competing claims to these receivables prior to April 15.

103. In late March of 1991, Mr. Bumgarner advised Capital Bank that General Plastics would not be able to make its monthly $7,914.50 payment on its loan due to Capital Factors' termination of advances. On April 2, 1991, two days after the monthly payment was due, Capital Bank declared its loan to General Plastics to be in default, and accelerated the loan to demand payment of the full amount of

principal and interest due ($481,161.88 as of April 1). General Plastics Ex. 137.

104. Capital Bank also sent a letter to Capital Factors on April 2 which stated, in relevant part,

> By virtue of the Factoring Agreement, Capital Bank shares with Capital Factors in all collateral from the subjects. Therefore, any excess funds collected from the accounts receivable over and above the outstanding indebtedness at Capital Factors, should [sic] remitted to Capital Bank and applied towards the subjects' [sic] debt, here at the bank.

General Plastics Ex. 138A. The basis asserted at trial for this claim was language in the Agreement providing that,

> [a]s collateral security for ... your [General Plastics'] ... indebtedness and obligations to us [Capital Factors] *and to each of our subsidiaries and affiliates* ..., you do hereby grant to us a security interest in all of your accounts.... You hereby irrevocably authorize and direct us to charge at any time to your account any Obligations, and to pay any Obligations owing to *any of our subsidiaries or affiliates by so charging your account.*

General Plastics Ex. 3, ¶ 8 (emphasis added).

105. Mr. MacMillan received Capital Bank's demand, and referred it to Capital Factors' lawyer. That attorney, who was also employed as counsel for Capital Bank, advised Mr. MacMillan that Capital Bank had a valid claim against General Plastics' receivables. Under ¶ 8 of the Agreement, Capital Bank claimed a right to receive the accounts receivable because it is an asserted affiliate of Capital Factors, and the Agreement allows Capital Factors to apply collected funds to debts owed by General Plastics to Capital Factors' affiliates. There was a non-frivolous basis for the Capital Bank demand on Capital Factors, although it does not appear that Capital Bank established perfection of its asserted rights.

106. The IRS also served two new Notices of Levy on Capital Factors to collect about $277,000 in unpaid taxes owed by General Plastics. The first Notice was dated March 21, 1991 and was received by Capital Factors on March 26. Capital Factors Ex. 5. The second Notice was dated and received on April 9, 1991. Capital Factors Ex. 6. Capital Factors responded to both Notices by stating that no funds were owed to the IRS out of General Plastics' receivables held by Capital Factors because the loan balance had not been eliminated (counting clearance days) as of either of those two dates. This answer was apparently accurate as a response to the first Notice, but was not true for the second response prepared on April 15, a day when Capital Factors was fully paid out. General Plastics argues that this second answer was "outrageous bad faith conduct". General Plastics Proposed Findings, p. 53. The evidence suggested that this response was the result of Mr. Herzog carelessly using the previous answer as a model for writing out this answer. Moreover, while this false response may have thrown the IRS off the trail for a time, General Plastics has not demonstrated how the response materially affected it.

107. The IRS prepared a Federal Tax Lien on March 26 and filed it on April 1, 1991. As a result of the IRS actions, the IRS created on the latter date a competing claim to those of Capital Bank and General Plastics. Further, Mr. Finn testified that he told Mr. Herzog that Capital Factors should apply funds accumulated after the loan was paid off to satisfy the IRS lien.

108. In addition to the IRS and Capital Bank, First Union was also asserting its rights. In April of 1991, General Plastics still had outstanding debt due to First Union. Thus, First Union's lawyer sent Capital Factors a letter on April 22, 1991, demanding that Capital Factors reassign its security interest in the receivables back to First Union because its loan had been fully repaid. General Plastics Ex. 143. First Union had conditioned its assignment of its security interest in General Plastics' receiv-

ables by stating that "[Capital Factors] will reassign said UCC–1's to [First Union] promptly upon satisfaction of the indebtedness to Capital Factors...." General Plastics Ex. 5. By its April 22 letter, First Union was calling on Capital Factors to honor that condition. It was also implicitly warning Capital Factors that it would seek to hold Capital Factors personally liable if it transferred funds in violation of that condition.

109. Therefore, Capital Factors was clearly justified in not returning receivables or paying for the proceeds thereon to General Plastics after April 15, 1991. There were three competing creditors claiming the receivables held by Capital Factors on that date, and Capital Factors reasonably apprehended that it might be liable to any or all of the three claimants should it ignore their claims and return the receivables to General Plastics.

### C. Payments by Capital Factors to General Plastics' Creditors in March and April of 1991

110. After March 19, Capital Factors refused General Plastics' repeated requests that collected funds be advanced directly to it. However, Capital Factors did agree to make certain accommodations toward the three competing claimants.

111. Following Capital Bank's demand letter of April 2, General Plastics and Capital Bank reached an agreement whereby the bank agreed to waive the default in return for a reduction of principal from about $476,000 to $300,000 plus the payment of accrued interest. *See* General Plastics Ex. 142 (reducing the agreement to writing). The money for this payment was to come from funds accumulated by Capital Factors from the payments on General Plastics' receivables. *Id.*

112. After this agreement was signed by Mr. Bumgarner, Capital Factors Ex. 98, Capital Factors sent three checks to Capital Bank totalling about $180,000. These payments were made on April 14, 15, and 19, 1991.

113. Contrary to General Plastics' argument, this agreement and Capital Factors' role in its execution are certainly not evidence of Capital Factors' bad faith. First, there is no evidence that Capital Factors played any role in the formation and negotiation of this agreement. Indeed, there is no evidence that Capital Factors acted as anything other than as an instrument for the execution of this agreement. Second, the pressure exerted on General Plastics to agree to this deal could only have come from two sources. Capital Bank had leverage because it was a substantial creditor. The only other source of pressure had to be an internal one. The obligation to Capital Bank arose through a guarantee of a loan made by Capital Bank to Mr. Knutson, General Plastics' sole shareholder. If Capital Bank was not satisfied by funds from General Plastics, it had the right to seek recovery from Mr. Knutson personally. General Plastics had a powerful incentive to protect its shareholder, and it cannot be said that the agreement was the product of duress placed upon it by Capital Factors. Third, General Plastics benefited from the Capital Factors' execution of the agreement. After the payments were made, Capital Bank waived the March 31 default, and it claimed no further interest in General Plastics' accounts receivable. By carrying out the agreement, Capital Factors helped to remove one of the three competing creditors' claims to the receivables in its possession.

114. On April 22, 1991, Capital Factors sent a $25,000 check to the IRS in response to the April 9 Notice of Levy. Capital Factors Ex. 8. This payment was authorized by Mr. Bumgarner. No further payments were made due to receipt of the April 12 letter from First Union's lawyer.

### D. Capital Factors' Interpleader Action

115. In late April and early May of 1991, lawyers for Capital Factors and First Union began a series of exchanges concerning Capital Factors' obligations to First Union. On April 29, Capital Factors' in-

house counsel told First Union's lawyer that "[Capital Factors] is in the process of preparing UCC–3 Assignments to [First Union] as set forth in your correspondence of April 22, 1991." Capital Factors Ex. 13. First Union's lawyer responded on May 3, demanding that this assignment occur promptly. Capital Factors Ex. 14. He further stated that Capital Factors had allowed certain filed financing statements to lapse, and that First Union would "hold Capital Factors responsible for any and all damages it has suffered and shall suffer" because of that lapse. *Id.* In response to that letter, Capital Factors obtained outside counsel.

116. Capital Factors' new lawyer then advised First Union of the competing claim of the IRS to General Plastics' receivables. Capital Factors Ex. 17. To resolve this dispute and to prevent itself from being held to either the IRS or First Union by favoring either party, Capital Factors filed an Action for Interpleader in the Circuit Court of Dade County, Florida on May 13, 1991. Capital Factors Ex. 19. The complaint named Capital Factors as the stakeholder of General Plastics' accounts receivable and the proceeds thereon. It further named General Plastics, Mr. Knutson, the IRS, and First Union as defendants with competing claims to this property.

117. The interpleader was then stayed by the subsequent bankruptcy. General Plastics' creditors filed an involuntary petition under 11 U.S.C. § 303 on May 22, 1991. General Plastics then consented to the entry of an order of relief and converted its case to a Chapter 11 reorganization on June 11, 1991. General Plastics removed the interpleader action to this Court and raised the issues now being litigated.

### E. Summary

118. To sum up, from March 19, 1991 until the date that the interpleader was filed, the accounts receivable and the proceeds thereon that were in Capital Factors' possession were always subject either to Capital Factors' undisputed right to repay its loan or to competing creditors' claims. These various creditors had at least arguable rights to the receivables, and Capital Factors could not have returned them to General Plastics without potentially exposing itself to liability towards those creditors. Thus, Capital Factors acted in good faith in not returning the receivables during this period. Furthermore, Capital Factors also acted in good faith when it made payments to Capital Bank and the IRS since these payments were freely authorized by General Plastics. Finally, it acted in good faith by filing a prompt Interpleader action to resolve competing claims against the monies it then held.

119. Legal standards contained in the Findings of Fact will stand as additional Conclusions of Law. Further facts discussed in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### Jurisdiction

1. This Court has subject matter jurisdiction to adjudicate this matter pursuant to 28 U.S.C. § 1334(b). Both parties agree and this Court concludes that this is a non-core proceeding that is related to General Plastics' bankruptcy proceeding under Title 11, U.S.C. However, this Court has authority to enter final judgments pursuant to the written consents thereto filed by both parties prior trial. 11 U.S.C. § 157(c)(2).

### I. Breach of Contract Claims

2. Well-established principles of contract law apply to interpret the Agreement and amendments thereto. "The central concern in interpreting contracts is the intent of the parties." *Travelers Insurance Co. v. Bartoszewicz*, 404 So.2d 1053, 1054 (Fla.1981). "To determine the intent of the parties, a court should consider the language in the contract, the subject matter of the contract, and the object and the purpose of the contract." *American Home Assurance Company v. Larkin General Hospital, Ltd.*, 593 So.2d 195, 197

(Fla.1992). In considering the different contract interpretations offered by General Plastics and Capital Factors, "a reasonable interpretation of a contract is preferred to an unreasonable one." *Excelsior Insurance Co. v. Pomona Park Bar & Package*, 369 So.2d 938, 941 (Fla.1979). Also, "every provision in a contract should be given meaning and effect and apparent inconsistencies reconciled if possible." *Id.*

3. Capital Factors did not breach the Agreement, as amended, when it unilaterally reduced the advance rate from 85 to 70% since such a reduction was explicitly allowed under the Agreement. In *National Westminster Bank v. Ross*, 130 B.R. 656 (S.D.N.Y.1991), a bank lending under an accounts receivable financing agreement had the right to advance "in its 'sole discretion ... up to a sum which shall not exceed' 80%" *Id.*, at 675 (quoting the agreement). The New York court interpreting this agreement stated, "[i]f the Bank did not advance 80% on any receivable, it had the contractual right to do so." *Id.* The same interpretation applies here. The liberal use of discretionary language in the Agreement clearly indicates that Capital Factors had discretionary powers to reduce the advance rate.

4. Of course, terms in a contract may be modified by the subsequent conduct of the parties. *Pan American Engineering Co., Inc. v. Poncho's Construction Co.*, 387 So.2d 1052, 1053 (Fla. DCA 1980). However, there was no evidence in this case to prove that the parties' course of conduct modified the provision allowing Capital Factors to reduce the advance rate in its discretion. General Plastics argues that Capital Factors' forbearance in 1987 modified the Agreement. Yet it is clear that Capital Factors only continued to advance funds because of a change in General Plastics' management, and that Capital Factors was standing on its contractual rights following the 1987 discovery of pre-billing. Therefore, General Plastics' argument fails in light of the evidence.

5. Capital Factors did not breach the Agreement, as amended, when it unilaterally suspended advances on March 18, 1991 or when it terminated the Agreement without notice on March 19, 1991. As discussed above in the Findings, the provision in ¶ 9 of the Agreement allowing Capital Factors to terminate without notice in the event of breach was not modified in either the 1988 or 1991 amendments. Therefore, since General Plastics had breached the Agreement by pre-billing invoices, Capital Factors was entitled to terminate the Agreement without notice.

6. It is well-established that a party's good faith cooperation is an implied condition precedent to performance of a contract. *Brickell Bay Club Assoc., Inc. v. Hernstadt*, 512 So.2d 994, 997 (Fla. DCA 1987); *Fernandez v. Vasquez*, 397 So.2d 1171, 1174 (Fla. DCA 1981). General Plastics was clearly not acting in good faith when it began, through acts of its senior managers, secretly and systematically to pre-bill its invoices and expose Capital Factors to the risk that the invoices in its possession would not ripen into bona fide receivables. General Plastics lost the right to expect full performance under the Agreement, and cannot validly complain that Capital Factors stopped advances in the face of its own bad faith and deceptive misconduct. *Id.*

7. Capital Factors complied with the day-to-day mechanics of the factoring relationship under the Agreement and amendments thereto with respect to (i) its methods and timing in posting assigned invoices and remittances thereon, (ii) its method and timing in advancing funds to General Plastics, and (iii) its method of calculating and charging for factoring commissions after June 1, 1988. The only areas in which Capital Factors breached the Agreement were (i) its calculation of factoring commissions prior to June 1, 1988, (ii) its method of calculating daily interest charges, (iii) its timing in applying new interest rates, and (iv) its posting of customer discounts when

shipping charges were not included in the discount.

8. Capital Factors did not breach the Agreement by retaining General Plastics' receivables after termination on March 19. First, it was entitled under the Agreement to retain and collect on those receivables in order to repay itself for outstanding advances to General Plastics.

9. There were three competing creditors claiming a right to the receivables by the time that these advances were completely repaid. Each of these creditors had claims, or arguable claims, that superseded General Plastics' right to have the receivables promptly returned or net proceeds promptly paid over. The IRS had a perfected lien pursuant to 26 U.S.C. § 6321 which applied to all property acquired from when the lien was filed until the lien was satisfied. *In re May Reporting Services, Inc.*, 115 B.R. 652, 656 (Bankr.D.S.D.1990), *citing Glass City Bank v. United States*, 326 U.S. 265, 267, 66 S.Ct. 108, 110, 90 L.Ed. 56 (1945). Furthermore, both Capital Bank and First Union had possible rights as secured creditors to the receivables. If either of those parties had a valid security interest, then Capital Factors would be obliged to pay it before paying General Plastics. *Cf. New Hampshire Bus Development Corp. v. F.R. Lepage, Inc.*, 832 F.2d 7, 10 (1st Cir. 1987) ("it is the obligation of the junior creditor to account for and pay over to the senior creditor sums collected"). Also, Capital Factors would have been liable for conversion if it had conveyed the receivables to General Plastics in the face of these claims. *Cf. Seaman v. Clearwater Oaks Bank*, 469 So.2d 246, 247 (Fla. DCA 1985) ("an action for conversion is a proper remedy for a secured party to bring against a third party when its collateral has been disposed of by the debtor"). Thus, Capital Factors was entitled to retain the receivables in order to resolve the competing claims without exposing itself to liability.

10. Capital Factors later discharged itself of liability for its possession of the receivables by filing its interpleader action in Florida state court. An interpleader is the appropriate remedy for a stakeholder who faces multiple liability for its disposition of a single fund regardless of the merit of the competing claims. *See* Fla.R.Civ.P. 1.240,

> Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability. It is not ground for objection to the joinder that the claim of the several claimants ... do not have a common origin or are not identical but are adverse and independent of one another or that the plaintiff avers that the plaintiff is not liable in whole or in part to any or all of the claimants.

*See also Bache Halsey Stuart Shields, Inc. v. Witous*, 411 So.2d 1324, 1326 (Fla. DCA 1982); *Newkirk Construction Corp. v. Gulf County*, 366 So.2d 813, 816 (Fla. DCA 1979) (both discussing the propriety of interpleader actions). By availing itself of this remedy, Capital Factors was protected against multiple liability for the competing claims. *See Manufacturers Life Insurance Company v. Cave*, 295 So.2d 103 (Fla.1974) (held that the failure to pay sums owed under a contract is not wrongful where the contract debtor promptly interpleads the fund after receiving the conflicting demands). *See also Glen Construction Company, Inc. v. Bank of Vienna*, 557 F.2d 1050 (4th Cir.1977) (held a contractor discharged its promise to pay supplier by paying the sums into the court registry when faced with the competing tax lien on the fund), and 5A *Corbin on Contracts*, § 1235 (1964 ed.):

> A payment of money into court, in accordance with a previously made tender according to contract, operates as actual performance of duty and as a discharge. The only judgment to which the creditor is then entitled is a judgment that the amount held by the officer of the court shall be delivered to him.

## II. *Bad Faith Claims*

11. Under Florida law, the duty of good faith is an implied term in every contract. *Champagne–Webber, Inc. v. Ft. Lauderdale*, 519 So.2d 696, 697 (Fla. DCA 1988); *First Nationwide Bank v. Florida Software Services, Inc.*, 770 F.Supp. 1537, 1542 (M.D.Fla.1991).

> in determining the nature and extent of the covenant of good faith and fair dealing between the parties, courts generally use a measure of the justifiable expectations of the parties. As a result, where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable expectations of the second party and consequently, the second party should be compensated for its damages and/or excused from performance.

*First Texas Savings Assoc. v. Comprop Investment Properties, Ltd.*, 752 F.Supp. 1568, 1574 (M.D.Fla.1990).

12. General Plastics asserts that Capital Factors violated its duty of good faith primarily by not continuing to lend at the 85% advance rate in the face of all the events that transpired in 1990 and 1991. However, a lender is not obligated to make loans solely because of its good faith duty when there is no contractual mandate to do so. *Riedel v. NCNB National Bank of Florida, Inc.*, 591 So.2d 1038 (Fla. DCA 1992); *Flagship National Bank v. Gray Distribution Systems, Inc.* 485 So.2d 1336 (Fla. DCA 1986). Moreover, "good faith may not be imposed to override the express terms of a contract." *Riedel*, 591 So.2d at 1040. This rule is consistent with· the concept of good faith which promotes reliance on justifiable expectations of the parties. A borrower can not have a justifiable expectation that it will receive a loan when the lender has no contractual obligation to make one. Lenders cannot be reasonably expected to lend in the absence of protections set out in a loan contract.

13. In this case, the Agreement provided no mandate to lend to General Plastics at an 85% advance rate. Instead, it allowed for Capital Factors to lower the advance rate or temporarily suspend advances in its discretion and to terminate advances if General Plastics breached the Agreement. Furthermore, given General Plastics' failing financial health, Capital Factors had ample justification for lowering the advance rate to 70% in June 1990. Upon discovering the pre-billing on top of its knowledge of the diminishing business, it had ample basis for suspending advances on March 18, 1991, and terminating the Agreement on March 19. Therefore, General Plastics' arguments based on bad faith have no merit. The duty of good faith cannot relied on to prevent Capital Factors from exercising its contractual rights under the Agreement.

14. General Plastics further argues that Capital Factors acted in bad faith by referring to its termination of advances on March 19 as a "suspension". *See* Capital Factors Ex. 4 (in which Mr. MacMillan discussed "Capital Factors' decision to *suspend* funding to General Plastics . . ." (emphasis added) in his March 22 letter to Mr. Bumgarner). The term "suspension" is often used to refer to a temporary cessation of affairs. Thus, General Plastics argues that Capital Factors lied to it about its intentions concerning termination.

15. This argument clearly has no merit. First, that same letter refers to Capital Factors' election to "discontinue advances" in its opening paragraph. *Id.* The word "discontinue" certainly implies a more permanent kind of change. Furthermore, a top level officer of Capital Factors had clearly indicated through phone calls and personal meetings that advances on assigned invoices would no longer be made, and that no new advances were contemplated under the present circumstances. General Plastics' executives clearly understood this. Therefore, Capital Factors was not deceptive in use of the word "suspension".

16. As for instances in which Capital Factors was shown to have breached the Agreement, the violations were relatively minor and not broadly indicative of bad

faith, although they warrant compensatory damages.

17. Capital Factors was also acting in accord with the Agreement and in good faith when it retained the assigned receivables and proceeds after termination. Faced by several competing claimants, Capital Factors clearly had to act to protect its own interests. Moreover, it continued to cooperate with General Plastics after termination by accounting for and collecting on receivables in its possession and by making payments to General Plastics' creditors pursuant to General Plastics' agreement and authorization.

18. Thus, General Plastics has not proven by a preponderance of evidence that Capital Factors acted in bad faith at any time relevant to this dispute.

### III. General Plastics' Tort Claims

### A. Conversion and Civil Theft

19. General Plastics argues that Capital Factors is liable for common law conversion and civil theft under Fla. Stat. § 812.014 because of its failure to return the receivables or the proceeds collected thereon after it terminated the Agreement. This argument fails because a necessary element of both common law conversion and statutory civil theft is that the plaintiff must have had a "present or immediate right to possession" of the allegedly converted property at the time of the conversion. *Page v. Matthews*, 386 So.2d 815, 816 (Fla. DCA 1980); *Allen v. C.I.T. Credit Corp.*, 133 So.2d 442, 445–46 (Fla. DCA 1961).[6] General Plastics had no immediate right to the receivables held by Capital Factors in April and May of 1991 because of the competing claims of the creditors. Therefore, Capital Factors cannot be liable to General Plastics for conversion or civil theft.

6. These cases only address the elements of conversion. However, the elements of civil theft under Fla.Stat. § 812.014 are identical except that civil theft has the added element of intent. *Compare* § 812.104(1) ("A person commits theft if he *knowingly* obtains ... the property of another *with intent* to ..." (emphasis added)),

20. Even assuming *arguendo* that Capital Factors breached its obligation to make "purchase price" payments to General Plastics, the conversion and civil theft claims must still fail. "Neither an obligation to pay money nor a breach of contract generally gives rise to a claim of conversion in tort." *Kee v. National Reserve Life Insurance Co.*, 918 F.2d 1538, 1541 (11th Cir.1990), *citing Belford Trucking Co. v. Zagar*, 243 So.2d 646, 648 (Fla. DCA 1970). This is so because "a claim for breach of contract to pay money which is not specifically identifiable cannot be the subject of conversion or theft." *Rosen v. Marlin*, 486 So.2d 623, 625 (Fla. DCA 1986). *See also Kee*, 918 F.2d at 1541, *citing Belford Trucking*, 243 So.2d at 648 ("money may be the subject of conversion only where 'it consists of specific money capable of identification' "). Money is specifically identifiable when currency is delivered into the possession of the defendant in a sealed container or dollars are deposited in a trust account. *See Belford Trucking*, 243 So.2d at 648 (giving examples of what constitutes specifically identifiable money). In these cases, the very dollars delivered or deposited are due and returnable to the plaintiff.

21. In the instant case, there is no specifically identifiable fund or money said to be converted. Capital Factors' contractual obligation was to make "purchase price" payments (as defined in the Agreement) to General Plastics in return for the assigned receivables. There was no provision in the Agreement mandating that the payments come from a specific source. Also, there was no provision mandating that Capital Factors segregate its accounts. Therefore, the money received for purchase price payments was not specifically identifiable. More specifically, Capital Factors had no obligation to turn over payments

*with City of Cars, Inc. v. Simms*, 526 So.2d 119, 120 (Fla. DCA 1988) ("neither knowledge nor intent is required to maintain an action for conversion"). *See also Globe Communications Corp. v. 2112 Congress Associates, Ltd.*, 538 So.2d 949, 949 (Fla. DCA 1989) (§ 812.014 requires criminal intent).

received from General Plastics' customers directly to General Plastics.

22. General Plastics cites *Aero International Corp. v. Florida National Bank of Miami*, 437 So.2d 156 (Fla. DCA1983), to support its conversion claim. In *Aero International*, the plaintiff deposited money into an interest-bearing escrow account with the defendant bank. A dispute arose over plaintiff's right to the escrowed funds, and defendant refused to credit the accrued interest into plaintiff's account. Plaintiff sued for conversion, and a jury found, *inter alia*, that the defendant,

> (1) occupied a fiduciary relationship with [plaintiff], (2) held in its possession specific, identifiable funds belonging to [plaintiff] as to which it had clear and specific instructions to place in [plaintiff's] checking account with the Bank, (3) intentionally and willfully refused to follow those instructions....

*Id.*, at 159. In other words, the jury in *Aero International* found that the defendant bank had misappropriated a specifically identifiable fund by not crediting that fund according to specific directions. The appeals court reversed the trial court's entry of judgment N.O.V. on the basis that sufficient evidence was presented to support the jury's findings. *Id. Aero International* provides no support for General Plastics' claims because it is clearly distinguishable from the instant case. General Plastics did not prove that proceeds received from its assigned invoices were to be deposited in an escrow account. It also failed to prove that Capital Factors had any instructions to transmit any payments received to any particular account or entity.

23. Thus, even if Capital Factors breached in any way its obligation to make purchase price payments, General Plastics' conversion and civil theft claims must fail. Capital Factors never owed General Plastics anything more than a general obligation to pay money, and General Plastics has not established that proceeds from assigned receivables were specifically identifiable property capable of being converted.

## B. Tortious Interference with Advantageous Business Relationships

■ 24. General Plastics argues that Capital Factors is liable for committing the tort of interference with advantageous business relationships. The basis for this claim is the contention that Capital Factors wrongfully terminated advances thereby causing General Plastics to close down and lose valuable relationships with its customers and suppliers. This claim primarily fails because Capital Factors had the right to terminate advances under the Agreement. In *Florida Telephone Corp. v. Essig*, 468 So.2d 543 (Fla. DCA 1985), the defendant forbade its contractor from hiring a particular subcontractor for its projects with the defendant. The subcontractor then sued the defendant for interfering with its relationship with the contractor. The appellate court held that the defendant was entitled to a directed verdict because it reserved the right in its contract with the contractor to remove subcontractors. *Id.* at 545. The defendant was therefore privileged to interfere with the sub-contractor's relationship with the contractor regardless of its motive for interfering. *Id.* This case is similar to *Florida Telephone* because Capital Factors had the contractual right under the Agreement to terminate advances and to terminate the Agreement without notice under the circumstances present on March 19, 1991. Therefore, Capital Factors was entitled to "interfere" by terminating advances regardless of its motive. *Id.*

■ 25. General Plastics also failed to establish all the necessary elements for this claim. To establish liability for tortious interference with advantageous business relationships, the plaintiff must establish, *inter alia*, that the "interference be both direct and intentional." *Rosa v. Florida Coast Bank*, 484 So.2d 57, 58 (Fla. DCA 1986). *See also Ethyl Corp. v. Balter*, 386 So.2d 1220, 1223 (Fla. DCA 1980) ("direct interference ... is indispensable to the existence of an actionable wrong"). General Plastics has failed to prove any

instance in which Capital Factors directly or intentionally interfered with any of General Plastics' business relationships.

26. Certainly, Capital Factors' termination of the Agreement affected General Plastics' relationships with its customers, suppliers, and other creditors since the termination of advances was one factor leading up to General Plastics' need to shut down operations. However, Capital Factors never directly interfered with any of General Plastics' relationships. Where the allegedly wrongful act merely creates circumstances leading to the loss of a business relationship, then the element of "direct interference" has not been satisfied. *See, e.g., Lawler v. Eugene Memorial Hospital Association*, 497 So.2d 1261 (Fla. DCA 1986) (no direct interference where defendant hospital terminated a doctor's staff privileges thereby damaging the doctor's relations with his patients and fellow doctors), and *Rosa*, 484 So.2d 57 (no direct interference where defendant mortgagee refused to permit assumption of a mortgage thereby damaging relations between plaintiff mortgagor and the purchaser of its property).

27. There is also no evidence that Capital Factors ever intended to interfere with any of General Plastics' business relationships. Its intent was rather to protect its own economic interests and reduce its risks. Therefore, General Plastics tortious interference claim must also fail for lack of the requisite intent. *Security Title Guarantee Corp. of Baltimore v. McDill Columbus Corp.*, 543 So.2d 852, 855 (Fla. DCA 1989).

28. Capital Factors did send a letter to General Plastics' customers on March 26, 1991, reminding them to continue sending remittances to Capital Factors. General Plastics Ex. 3. However, this letter did not relate in any way to the buyer-seller relationship between General Plastics and its customers. It merely related to remittances, and Capital Factors had a right to continue receiving remittances at that time because there were outstanding advances still due.

29. General Plastics argues that Capital Factors had the necessary intent because it knew that terminating advances would cause General Plastics to shut down. It cites *McCurdy v. Collis*, 508 So.2d 380, 383, n. 2 (Fla. DCA 1987), which cites to *Florida Standard Jury Instruction (Civil)*, MI 7.2, for a definition of intentional interference that includes "[knowledge] that the interference is substantially certain to occur as a result of [defendant's] action." General Plastics did not establish at trial that Capital Factors could know with certainty that a termination of advances was "substantially certain" to result in a shut down of General Plastics' plant. While this was likely, it was by no means certain. In March of 1991, General Plastics could have looked to either its shareholder or its solvent affiliate in Dallas, Texas for fresh capital. The fact that they hadn't contributed anything up to that point did not mean that they could not or would not step into the breach after Capital Factors terminated advances. Moreover, it was certainly possible that a new lender would be found to loan against the historically strong receivables. Therefore, even under a more relaxed definition of intent, General Plastics' claim still fails.

## IV. *General Plastics' Request for Accounting*

30. General Plastics seeks an accounting to determine the extent of damages for its breach of contract claims. An accounting is an appropriate remedy "where the contract demands between litigants involve extensive or complicated accounts and it is not clear that the remedy at law is as full, adequate and expeditious as it is in equity." *F.A. Chastain Construction Inc. v. Pratt*, 146 So.2d 910, 913 (Fla. DCA 1962). From the evidence deduced in this first part of the bifurcated trial, it would appear that the calculation of interest and commission overcharges, as well as the determination of damages caused by Capital Factors' errors in post-

ing, *see* Conclusions, *supra,* ¶ 7, may be an extensive and complicated process. However, all the evidence on damages has not been heard since that issue was reserved for the second phase of the bifurcated trial. Therefore, judgment is reserved on whether an accounting is needed to determine damages.

■■■ 31. Capital Factors argues that the request for an accounting is barred by the Fla.Stat. § 95.11(3)(p), which provides a four year limitations period for "any action not specifically provided for in these statutes." However, General Plastics' accounting claim is governed by Fla.Stat. § 95.11(2)(b), which provides a five year limitations period for "a legal or equitable action on a contract, obligation, or liability founded on a written instrument" because this accounting action was based on Capital Factors' alleged breach of its obligations under the written factoring agreement. Capital Factors cites *Voliva v. Bennett,* 201 F.2d 434 (5th Cir.1953), which applied Florida's four year limit to an accounting action. However, the plaintiff in *Voliva* based her complaint on the allegation that defendant fraudulently induced her to transfer shares of stock. *Id.,* at 435–36. The liability in that case was derived from an alleged act of fraud, rather than on a written contract, as is the case here. Therefore, *Voliva* is distinguishable and does not support Capital Factors' argument.

32. General Plastics filed its counterclaim on September 27, 1991, and the alleged breaches of contract occurred within five years prior to that date. Therefore, its action for an accounting is timely under § 95.11(2)(b), the applicable Statute of Limitations.

## V. *Remaining Issues*

■■■ 33. General Plastics has requested attorneys' fees under Fla.Stat. § 57.-105(2), which provides,

If a contract contains a provision allowing attorney's fees to a party when he is required to take any action to enforce the contract, the court may also allow rea-

sonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract. . . .

The only reference to attorneys' fees in the Agreement as amended is in ¶ 10(h) which provides, "[i]n the event that we retain counsel for the purpose of collecting any indebtedness due us from you, you agree to pay the reasonable fees and expenses . . . of our counsel." General Plastics Ex. 3. The term, "we" refers to Capital Factors, and "you" refers to General Plastics. Since, there is no provision allowing General Plastics to recover attorneys' fees for enforcing the Agreement, it is not entitled to attorneys' fees under § 57.105(2).

34. For reasons earlier discussed, Capital Factors was entitled to bring its interpleader action under Fla.R.Civ.P. 1.240, and the General Plastics' arguments to the contrary have been found without merit.

■■■ 35. Capital Factors contends that it is entitled to attorney's fees as the stakeholder in the interpleader. "A party who is entitled to sue in interpleader is ordinarily permitted to recover his reasonable attorney's fees from the interpleaded fund." *Bache Halsey Stuart Shields, Inc. v. Witous,* 411 So.2d at 1326, *citing Miller v. Gulf Life Insurance Co.,* 148 Fla. 1, 3 So.2d 519 (1941). The Court has already ruled that Capital Factors properly brought this interpleader. However, Capital Factors' right to attorneys' fees extends to the interpleaded fund, i.e. the receivables and the proceeds thereon, or to the distributees of the fund. *Id.* The interpleaded fund has already been distributed through orders entered in General Plastics' bankruptcy case, and Capital Factors has not demonstrated that General Plastics received any distribution from the receivables. Furthermore, other defendants to the interpleader have been dismissed. Therefore, under the current posture of this case, Capital Factors is not entitled to seek attorneys' fees against any party nor against General Plastics under the common law rule espoused in *Witous.*

### CONCLUSION

No final judgment will be entered until the second phase of this bifurcated trial is concluded. Accordingly, an interlocutory order will be entered on this day that is consistent with the above Findings and Conclusions. The order will further set this case for status to discuss the next phase of the trial to determine damages and whether an accounting is necessary.