**GENERAL INSURANCE COMPANY OF AMERICA, Plaintiff,**

v.

**K. CAPOLINO CONSTRUCTION CORP., K. Capolino Design and Renovation, Ltd., Kenneth L. Capolino and Patricia M. Capolino, Defendants.**

**No. 94 Civ. 8089 (WCC).**

United States District Court, S.D. New York.

Nov. 9, 1995.

Hart & Hume, New York City (Benjamin D. Lentz, of counsel), for plaintiff.

Meyer & Wild, New York City (J. Edward Meyer, Patricia B. Wild, of counsel), for defendants.

WILLIAM C. CONNER, Senior District Judge:

Plaintiff General Insurance Company of America ("General") has brought this action against defendants K. Capolino Construction Corporation, K. Capolino Design and Renovation, Ltd., Kenneth L. Capolino and Patricia M. Capolino (collectively, "Capolino") seeking indemnification for costs incurred in completing construction contracts for which General had issued performance bonds on Capolino's behalf. The parties have made cross-motions for summary judgment. For the reasons set forth below, both motions are denied.

## BACKGROUND

On September 22, 1988, defendants executed an agreement under which Capolino agreed to indemnify General for all losses and expenses, including attorney's fees, incurred by General under any bonds that it might issue on Capolino's behalf. Subsequently, on February 19, 1992, Capolino entered into a contract with the White Plains Housing Authority ("WPHA" or "Owner") to perform construction improvements at the Winbrook Apartments in White Plains. The scheduled contract completion date was March 1, 1993. On the same day the construction contract was signed, General, as surety, and Capolino, as principal, executed and delivered to the WPHA, as obligee, per-

formance and payment bonds for that contract. On May 11, 1992, Capolino contracted with the WPHA to perform construction improvements at the Schuyler–DeKalb Apartments in White Plains. The agreed completion date for that project was May 11, 1993. General subsequently issued performance and payment bonds on that contract as well. Except for the contract prices and completion dates, the pertinent terms of the two construction contracts and two sets of bonds are identical.

Almost from the outset, the relationship between Capolino and the WPHA was less than harmonious. On November 23, 1992, the WPHA informed Capolino by letter that it was considering declaring Capolino to be in default on both of the contracts. Two days later, Capolino sent a written response contending that it was not in default on either contract and that it had previously declared the WPHA in default on both. On December 15, 1992, the WPHA sent letters to Capolino declaring Capolino in default and terminating each of the contracts on seven days' notice. The WPHA also wrote to General, informing it of the declarations of default and requesting a meeting to discuss General's obligations under the performance bonds. In January and February 1993, Capolino, the WPHA and General attempted to settle the disputes. When settlement proved impossible, the WPHA renewed its demand on General to complete the two contracts. General, based on its own investigation into the situation, concluded that Capolino was in default and elected to perform.

In March 1993, General and the WPHA entered into an agreement for the completion of the projects. The agreement specifically recognized that both Capolino and the WPHA had declared one another in default and that each disputed the propriety of the other's declaration. The agreement also expressly stated that General, Capolino and the WPHA reserved their respective rights and claims. The agreement further provided that General would receive the balance of the contract prices. The parties do not dispute that the balance remaining on the Winbrook contract was $33,857.65, while the balance on the Schuyler–DeKalb contract was $66,-127.15. According to the complaint, the WPHA has paid General a total of $94,232.10. General's contractor, Ackerman Construction Consultants, Inc., completed the projects in the summer of 1993.

This action is only one component of the litigation among the WPHA, Capolino and General. In February 1994, Capolino filed an action in New York State court asserting claims against General for, *inter alia*, breach of contract and tortious interference and against the WPHA for, *inter alia*, breach of contract, fraud and RICO violations. That action was removed to this court and subsequently dismissed. In addition, an action is currently pending in New York State court between the WPHA and Capolino that encompasses their respective claims of breach of contract.

On November 8, 1994, General filed this diversity action seeking to recover, under the terms of the indemnity agreement and under common law principles, approximately $132,-000 in expenses that it has incurred in completing the projects and in bringing this action. Capolino has filed counterclaims against General seeking a declaratory judgment that Capolino is not liable for the costs of completion. Capolino also seeks damages in the amount of the contract balances paid to General and indemnity for any judgment that the WPHA may be awarded against Capolino. Finally, Capolino has alleged damages of $250,000 from General's purported tortious interference in Capolino's contractual relationship with the WPHA. Both General and Capolino have filed motions for summary judgment. General seeks summary judgment on the issue of Capolino's liability, while Capolino requests summary judgment dismissing the complaint.

## DISCUSSION

We may grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In evaluating a party's request for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

■ Because General and Capolino entered into an express contract of indemnification, in the absence of bad faith, the "indemnity agreement governs the relationship between ... contractor and ... surety." *Bib Construction Co. v. Fireman's Insurance Co.*, — A.D.2d —, 625 N.Y.S.2d 550, 553 (App.Div.1995); *see International Fidelity Ins. Co. v. Spadafina*, 192 A.D.2d 637, 596 N.Y.S.2d 453, 454 (1993); *Maryland Casualty Co. v. Grace*, 292 N.Y. 194, 200, 54 N.E.2d 362, 364 (1944). The indemnity agreement at issue in this case clearly and unambiguously sets forth the rights and obligations of the parties. It provides that, on demand, Capolino will pay to General all losses and expenses, including attorney's fees, incurred by General "by reason of having executed any Bond" on Capolino's behalf. *See* General Agreement of Indemnity for Contractors, attached as Exhibit 2 to Affidavit of Wendy Ling, dated May 5, 1995. In the event of default by Capolino, the agreement states that General has the right, at its sole discretion, to take possession of the work for which a bond was executed and to arrange for the project's completion. The agreement further provides that Capolino is deemed to be in default if the obligee of a bond declares it to be in default. Moreover, the agreement states that General, as surety, has the exclusive right to determine in good faith whether any claims made on a bond shall be paid, compromised or defended. *See id.*

■ Under New York law, it is well-settled that a party that pays a claim it is not obligated to pay is a volunteer and may not recover those expenses. *See National Union Fire Ins. Co. v. Ranger Ins. Co.*, 190 A.D.2d 395, 599 N.Y.S.2d 347, 348 (1993) (citing *Koehler v. Hughes*, 148 N.Y. 507, 511, 42 N.E. 1051, 1052–53 (1896)); *Fidelity & Casualty Co. v. Finch*, 3 A.D.2d 141, 159 N.Y.S.2d 391, 394 (1957). Thus, General may not recover from Capolino unless, under the terms of the performance bonds that General issued on Capolino's behalf, General was obligated to complete the Winbrook and Schuyler–DeKalb projects. The relevant portions of the performance bonds state that:

If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

3.1 The Owner has notified the Contractor and the Surety ... that the Owner is considering declaring a Contractor Default ...; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract....; and

3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety....

Performance Bond, at ¶ 3, attached as Exhibit E to Affidavit of Kenneth L. Capolino, dated Apr. 26, 1995. Contractor Default is defined as "[f]ailure of the Contractor ... to perform or otherwise to comply with the terms of the Construction Contract[,]" while Owner Default is defined as "[f]ailure of the Owner ... to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof." *Id.*, at ¶¶ 12.3, 12.4.

With these legal principles and contractual provisions in mind, we turn to an examination of the parties' motions for summary judgment.

## A. General's Summary Judgment Motion

General seeks summary judgment on the issue of Capolino's liability for the expenses that General incurred completing the Winbrook and Schuyler–DeKalb projects. General maintains that an issue of fact exists regarding whether Capolino was in default on the construction contracts. Nevertheless, General argues that summary judgment is appropriate in this case because whether Capolino was actually in default is irrelevant to the determination of Capolino's liability under the indemnity agreement. According to plaintiff, under the plain language of the performance bonds, General's obligation to complete the projects arose when the WPHA *declared* Capolino in default for failure to perform and gave written notice that it was

terminating the contracts.[1] General asserts that there is no dispute that those events occurred. General further contends that, in the event that the WPHA's declarations of default are found to be improper, Capolino can recover any damages awarded to General from the WPHA.

Capolino counters that General is not entitled to indemnification because its obligation under the performance bonds arises only if the owner is not in default. *See* Performance Bond, at ¶ 3. Capolino contends that the WPHA was in default for withholding progress payments from Capolino despite reports from the architect that revealed that the Winbrook project was complete and that the Schuyler–DeKalb project was nearly complete. Capolino argues, therefore, that General completed the projects as a volunteer. General responds that it investigated the situation before it agreed to complete the projects and that it was satisfied that the WPHA was not in default.

The terms of the performance bond should, if unambiguous, be given their "plain, ordinary, and proper meaning." *Dupack v. Nationwide Leisure Corp.,* 73 A.D.2d 903, 424 N.Y.S.2d 436, 439 (1980); *see Estate of Camarda,* 103 Misc.2d 362, 425 N.Y.S.2d 1012, 1015 (1980). The performance bonds at issue here state that the surety's obligation arises "[i]f there is no Owner Default." Performance Bond, at ¶ 3. The bonds do not say that the surety's obligation arises if the surety is satisfied that there is no owner default. Therefore, General is obligated to complete the contracts only if the WPHA was actually not in default. The performance bonds specifically provide that failure to make required payments to the contractor constitutes default by the owner. *See* Performance Bond, at ¶ 12.4. Because Capolino contends that the WPHA failed to make required progress payments that were due to Capolino, *see* April 26 Capolino Affidavit, at ¶ 38, while General contends that Capolino received all

that it was due and perhaps more, *see* May 5 Ling Affidavit, at ¶ 7, an issue of fact exists regarding whether the WPHA was in default. *See also Hunt v. Bankers & Shippers Ins. Co.,* 60 A.D.2d 781, 400 N.Y.S.2d 645, 647 (1977) (finding triable issue of fact where surety and owner disputed whether owner made timely progress payments to contractor). This issue of fact defeats General's motion for summary judgment.

Capolino also contends that General was not obligated to complete the projects because the WPHA failed to terminate the contracts formally, as required by the performance bonds. No formal termination procedure is set forth in the performance bonds, but the bonds incorporate and must be construed with the construction contracts. *See* Performance Bond, at ¶ 1; *Hunt,* 400 N.Y.S.2d at 647. The pertinent provisions of those agreements state that the owner may only terminate the construction contracts on seven days' written notice and upon certification by the architect of sufficient cause for the termination. *See* General Conditions of the Contract for Construction, at ¶ 14.2.2, attached as Exhibit C to April 26 Capolino Affidavit. Capolino puts forward the architect's deposition testimony, taken during discovery in the pending state court action, in which he states that he never provided such a certification with respect to either the Winbrook or Schuyler–DeKalb projects. *See* Transcript of Deposition of Bernard S. Arnold, dated Mar. 30, 1995, at 88, attached as Exhibit J to April 26 Capolino Affidavit. Capolino argues that because there was no architect certification, the contracts were not formally terminated, and General completed the projects as a volunteer. General counters that the architect was present at a January 1993 meeting held at the WPHA office and that he was firmly convinced that Capolino was in default. *See* Affidavit of Wendy Ling, dated May 17, 1995, at ¶¶ 6–7. Because other issues of fact exist that are suffi-

1. There is support for General's position in the case law. *See, e.g., Bib Construction,* 625 N.Y.S.2d at 553 (once owner declared contractor in default, surety was obligated to complete project regardless of surety's belief that default was improper and, under indemnity agreement, contractor's duty to indemnify surety was implicat-

ed); *Spadafina,* 596 N.Y.S.2d at 454 (under indemnity agreement between surety and contractor, contractor must reimburse surety for good faith settlement payment to subcontractor whether or not contractor was actually liable to subcontractor).

cient to defeat General's motion for summary judgment, we need not rule on whether the WPHA formally terminated the contracts within the meaning of the terms of the performance bonds. At this time, we simply note the existence of this additional area of disagreement between the parties.

■ In addition, Capolino argues that General is not entitled to summary judgment because General has breached the indemnity agreement. Capolino points out that the indemnity agreement imposes on General an obligation to act in good faith when deciding whether to pay, settle or defend a claim made by an obligee under a bond. Capolino contends that General acted in bad faith in electing to complete the contracts because any thorough investigation would have revealed that the WPHA was in default and had improperly terminated the contracts with Capolino. Capolino also asserts that during the course of negotiations between the WPHA, Capolino and General, General promised Capolino that it would be permitted to complete the projects, although General would bring in another contractor to be nominally in charge in order to mollify the WPHA. Capolino contends that General reneged on this deal without informing Capolino by hiring Ackerman to replace Capolino on the projects. Capolino asserts that General was motivated by the desire to receive the balance of the contract payments from the WPHA. See April 26 Capolino Affidavit, at ¶¶ 49–50; Affidavit of J. Edward Meyer, dated May 1, 1995, at ¶¶ 8–12.

General admits that it cannot be granted summary judgment if an issue of fact exists regarding its good faith in completing the projects. See Plaintiff's Memorandum in Opposition, at 15; *National Surety Co. v. Fulton,* 192 A.D. 645, 183 N.Y.S. 237, 239 (1920) (surety's good faith in agreeing to make payment under bond is question for jury despite "abundant evidence" of good faith). General contends, however, that in this case we can

find, as a matter of law, that it acted in good faith. It argues that there is no dispute that it investigated the situation before determining that Capolino had breached the construction contracts and that the WPHA had not. Furthermore, it asserts that any proposal that was made to Capolino about participating in the completion of the projects was made in the context of settlement discussions and is therefore inadmissible. General further argues that the proposal was clearly no longer a viable option once settlement proved impossible. See May 17 Ling Affidavit, at ¶¶ 10–11. General contends that it kept Capolino fully informed of the progress of its negotiations with the WPHA, of the terms of the agreement that General and the WPHA signed, and of its intention to use Ackerman to complete the projects. See May 5 Ling Affidavit, at ¶¶ 9–11.

We need not, of course, decide at this juncture whether General acted in good faith. To defeat summary judgment, all Capolino must demonstrate is the existence of an issue of fact regarding General's good faith in completing the contracts. Drawing all justifiable inferences in Capolino's favor, we cannot say, as a matter of law, that General was acting in good faith.

Accordingly, General's motion for summary judgment on the issue of Capolino's liability is denied.

## B. Capolino's Summary Judgment Motion

■ On its motion for summary judgment, Capolino argues that we should hold, as a matter of law, that General was not obligated to complete the projects and that, as a volunteer, it is not entitled to recover its expenses. Capolino advances three arguments in support of its position.[2] First, Capolino argues that the WPHA was in default and therefore, under the plain language of the performance bonds, General had no obligation to step in. We have already found

2. Capolino also asserts that certain technical defects render the performance bonds invalid and that General was therefore under no obligation to intervene. Capolino argues that the Schuyler-DeKalb performance bond is defective because it is dated May 7, 1992, although the construction contract that it incorporates was not signed until May 11, 1992. Capolino contends that the Winbrook Bond is defective because the amount for which it was written differs from the amount the Department of Housing and Urban Development had approved to fund the project. Capolino cites no authority for either proposition, and we find both contentions unpersuasive.

that a disputed issue of fact exists as to whether the WPHA was in default. Next, Capolino contends that General acted in bad faith in taking over the projects, thereby breaching the indemnity agreement. General, however, vigorously disputes the truth of this assertion, raising another question of fact. Third, Capolino argues that we may hold, as a matter of law, that General should not have stepped in because Capolino was not in default. For the purposes of determining Capolino's liability to General for General's expenses, however, it is irrelevant whether Capolino was actually in default. *See Spadafina*, 596 N.Y.S.2d at 454. The plain language of the performance bonds and indemnity agreement provides that General's obligation under the bonds arises if the WPHA declares Capolino in default and formally terminates the contracts, whether or not that action was proper.[3]

Accordingly, Capolino's motion for summary judgment dismissing this action is denied.

## CONCLUSION

For the reasons set forth above, the parties' cross-motions for summary judgment are denied.

SO ORDERED.

---

[3] Furthermore, even if the issue of whether Capolino was actually in default were relevant to this decision, the parties dispute several material facts. Capolino contends that it cannot have been in default because both projects were complete or almost complete months before the scheduled final completion date. *See* Affidavit of Kenneth L. Capolino, dated May 16, 1995, at ¶ 4. Capolino also asserts that it did not stop work at the sites until it was preempted by Ackerman.

*See* Affidavit of Kenneth L. Capolino, dated May 24, 1995, at ¶ 7. By contrast, General contends that Capolino had failed to complete work on the windows at Schuyler–DeKalb and had failed to meet several interim deadlines. General states that its investigation established that Capolino had stopped work at the sites during the fall of 1992. *See* May 5 Ling Affidavit, at ¶ 7; May 17 Ling Affidavit, at ¶ 8.