**THE REVENUE MARKETS, INC., Plaintiff,**

v.

**AMWEST SURETY INSURANCE COMPANY, Defendant.**

No. 97–276–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Nov. 9, 1998.

Paul M. Woodson, James E. Glass Associates, Miami, FL, for plaintiff.

Bruce Charles King, Carlton Fields, Miami, FL, for defendant.

## ORDER

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendant/Counterclaim Plaintiff Amwest Surety Insurance Company's Motion for Final Summary Judgment (DE # 80, filed September 9, 1998). The Motion is ripe.

### I. Background

In July 1993, Plaintiff/Counterclaim Defendant The Revenue Markets, Inc. ("TRMI") entered into a contract with Dade County, Florida, wherein TRMI agreed to furnish labor, material, and equipment for the construction of a highway toll collection system. The construction contract called for TRMI to obtain a payment and performance bond from a surety guaranteeing TRMI's performance under the contract. Pursuant to that obligation, TRMI, as well as Counterclaim Defendants Robert and Eleanor Rosakranse (collectively "the Rosakranses"),[1] entered into a general indemnity agreement ("the Indemnity Agreement") with Defendant/Counterclaim Plaintiff Amwest Surety Insurance Company ("Amwest").

Under the terms of the Indemnity Agreement, Amwest as surety issued a payment and performance bond in the amount of $3.5 million, guaranteeing the performance of TRMI as principal under the construction contract. In consideration, TRMI and the Rosakranses as individuals agreed to indemnify Amwest for any losses, demands, or costs accruing to Amwest as a result of its issuance of the payment and performance bond.[2] In addition, TRMI executed a $300,-

---

1. Robert Rosakranse is President of TRMI, Eleanor Rosakranse is Secretary.

2. Because of the importance of the language of the Indemnity Agreement to the following analysis, the relevant provisions are reproduced here:

2. INDEMNITY—In consideration of the execution and delivery by the Surety of the Bonds on behalf of the Principal, the Undersigned agree to indemnify and hold the Surety harmless from and against any and all demands, liabilities, losses, costs, damages, attorneys' fees and expenses of whatever kind or nature which arise by reason of, or in consequence of, the execution by the Surety of any Bond on behalf of the Principal and whether or not the Surety shall have paid any sums in partial or complete payment thereof, including but not limited to: sums paid including interest, or liabilities incurred in settlement of claim....

A. The liability of the undersigned shall extend to and include all amounts paid by the surety in good faith under the belief that 1) principal was in default as hereinafter described in Section 3 of this agreement; 2) surety was or might be liable therefor; 3) such payments were necessary or advisable to protect any of surety's rights as to avoid or lessen surety's liability or alleged liability.

....

E. Surety shall have the right to reimbursement of its expenses, premiums and attorneys' fees ... irrespective of whether any Bond loss payment has been made by Surety.

....

3. DEFAULT—Principal shall be in Default with respect to a Contract and hereunder if any of the following occur:

....

B. Any Obligee declares Principal to be in Default.

....

5. COLLATERAL SECURITY—If a claim is made against Surety, whether disputed or not, or if Surety deems it necessary to establish a reserve for potential claims, and upon demand from Surety, the Undersigned shall deposit with Surety cash or other property acceptable to Surety, as collateral security, in sufficient amount to protect Surety with respect to such claim or potential claims and any expense or attorneys' fees. Such collateral may be held or utilized by Surety until it has received evidence of its complete discharge from such claim or potential claims, and until it has been fully reimbursed for all loss, expense, attorneys' fees and unpaid premiums.

....

8. GENERAL PROVISIONS

....

F. Surety shall have the right, at its option and in its sole discretion, to issue or cancel or decline the execution of any Bond....

G. Surety may consent to any changes or alterations in a Contract or Bond, without affecting the liability hereunder of the Undersigned, including but not limited to riders extending the time of completion, or increases or decreases in the penal sum of the bond....

000 letter of credit as collateral security in favor of Amwest.

On June 16, 1995, Dade County declared TRMI to be in default on its construction contract, and terminated TRMI as contractor. In response, TRMI filed suit against Dade County ("the TRMI–Dade County litigation") on June 23, 1995. Having declared TRMI to be in default, Dade County called upon Amwest as surety to complete TRMI's obligations under the construction contract. In addition, there were apparently $700,000 in payment bond claims against TRMI from various unpaid suppliers and subcontractors. Amwest retained Guardian Group, Inc. ("Guardian") to act as consultant on behalf of Amwest in reviewing the situation between Dade County and TRMI. During this review, Amwest asked TRMI to provide certain confidential information to Guardian to aid it in its investigations into the dispute. In an agreement between TRMI and Guardian ("the Nondisclosure Agreement"), TRMI agreed to supply confidential information to Guardian in return for Guardian's promise not to disclose the information. Amwest was not party to this Nondisclosure Agreement.

While the TRMI–Dade County litigation was pending, Amwest attempted to have TRMI and Dade County reach a workout or settlement. During the process, Amwest incurred approximately $330,000 in claims-related expenses, as well as a $75,000 payout on behalf of TRMI under the construction contract.

In February 1996, Dade County advised Amwest that it would not permit TRMI to complete its construction contract. At this point, the TRMI–Dade County litigation was still pending. Faced with possible liabilities in excess of $3.5 million, and believing TRMI to be in default, Amwest negotiated a settlement with Dade County in August 1996 ("the Bond Cancellation Agreement"), wherein Amwest agreed to pay Dade County up to $1 million for the cost of utilizing a substitute contractor in place of TRMI, and in return, Dade County promised to terminate Amwest's obligations and liabilities to Dade County under Amwest's payment and performance bond. In addition, the Bond Cancellation Agreement called for Amwest to provide information and other assistance to Dade County in the TRMI–Dade County litigation. Finally, the Bond Cancellation Agreement provided for Amwest to share in 25% of any monies recovered by Dade County from TRMI.

In the spring of 1996, Amwest requested that TRMI return certain construction equipment to Dade County, even though Dade County had not yet paid for it. TRMI handed the equipment over, but in return, Amwest provided a $250,000 letter of credit to TRMI to cover any potential indemnity claims that Amwest might bring against TRMI.

In October of 1996, Amwest liquidated the $300,000 letter of credit put up by TRMI as collateral security under the Indemnity Agreement. At the time it did so, Amwest had not paid any monies over to Dade County.

In December 1996, the TRMI–Dade County litigation came to a close, and TRMI was awarded approximately $3.5 million in damages. TRMI subsequently filed suit against Amwest in January 1997. In its suit, later amended in October 1997, TRMI brings claims for breach of contract and bad faith

H. Surety shall have every right, defense, or remedy which a personal Surety without compensation would have, including the right of exoneration.

I. Until Surety shall have been furnished with conclusive evidence of its discharge without loss from any Bonds, and until Surety has been otherwise fully indemnified as hereunder provided, Surety shall have right of free access to the books, records and accounts of the Undersigned for the purpose of examining and copying them.... Surety may furnish any information, which it now has or may hereafter acquire concerning the Undersigned, to other persons, firms or entities for the purpose of procuring co-suretyship or reinsurance or of advising such persons, firms, or entities as it may deem appropriate.

. . . .

9. WAIVER OF NOTICE—We agree that the Company need not give us, or any of us, notice of any act, fact or information coming to the notice or knowledge of the Company concerning or affecting its rights or liabilities under any such bond or out rights or liabilities hereunder, notice of all such being hereby expressly waived.

against Amwest, alleging that: (1) Amwest provided confidential information about TRMI to Dade County during the TRMI–Dade County litigation; (2) Amwest cooperated with and benefitted from Dade County during the TRMI–Dade County litigation; and (3) Amway liquidated the $300,000 letter of credit against TRMI even though Amway had not performed under the Indemnity Agreement. In response, Amwest filed a countersuit in April 1998, alleging that: (1) TRMI should, under the Indemnity Agreement of April 1990, indemnify Amwest for all losses and expenses incurred by Amwest; and (2) TRMI should, under the equitable doctrines of exoneration and quia timet, secure Amwest for any future losses and expenses arising out of Amwest's issuance of its payment and performance bond.

## II. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment may be entered only where there is no genuine issue of material fact. *See Twiss v. Kury*, 25 F.3d 1551 (11th Cir.1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* at 157.

However, the non-moving party "[m]ay not rest upon the mere allegations and denials of [its] pleading, but [its] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the

[non-movant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In fact,

> the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *Id.*

## III. Discussion

### A. TRMI's Claims

TRMI's Complaint alleges breach of contract and breach of an attendant implied duty of good faith by Amwest in the following violations: (1) Amwest shared confidential information about TRMI with Dade County; (2) Amwest liquidated TRMI's $300,000 letter of credit; (3) Amwest cooperated with Dade County in the TRMI–Dade County litigation, by providing witnesses and other aid; (4) Amwest did not disclose to TRMI its negotiations with Dade County regarding the Bond Settlement Agreement; and (5) in the Bond Settlement Agreement, Amwest is to share in any recovery by Dade County against TRMI.

### 1. Breach of Contract Claims

The Court finds that there is no genuine issue of material fact as to whether Amwest breached any contract—specifically the Indemnity Agreement signed by Amwest as surety and TRMI and the Rosakranses as guarantors/principals. The terms of the Indemnity Agreement are very clear on Am-

west's rights as surety.[3] TRMI was in "default," and Amwest's rights under the Agreement were triggered, as soon as Dade County declared TRMI to be in default.[4] At that point, not only did Amwest's subsequent actions not violate any of the terms of the Indemnity Agreement, but such conduct was explicitly authorized by the Agreement.

### a. Breach of Duty of Confidentiality

■ The first alleged breach of the Indemnity Agreement is Amwest's sharing of confidential information about TRMI with Dade County. TRMI claims that this occurred through Guardian, the company hired by Amwest in its investigation of the underlying TRMI–Dade County dispute. While it is true that Guardian was not to divulge any confidential information that it received from TRMI under the Nondisclosure Agreement, it is also true that the Nondisclosure Agreement specifically states that it is "by and between Guardian Group, Inc. . . . and The Revenue Markets, Inc."—nowhere is Amwest named or implicated as a party to the Nondisclosure Agreement. TRMI does not advance any argument for why Guardian's duty of confidentiality should extend to the Indemnity Agreement, or ultimately to Amwest. The Court therefore finds that Amwest could not possibly have breached the Nondisclosure Agreement, since it was not party to that Agreement.

■ TRMI also claims that Amwest breached the Indemnity Agreement by sharing confidential information with Dade County directly. The Court finds that this cannot be interpreted as a breach of the Agreement, because section 8(I) of the Agreement explicitly authorizes Amwest to "have right of free access to the books, records and accounts of [TRMI] for the purpose of examining and copying them," and Amwest "may furnish any information, which it now has or may hereafter acquire concerning [TRMI] to oth-er persons, firms or entities . . . as it may deem appropriate."

### b. Improper Liquidation of TRMI's $300,000 Collateral Security

■ TRMI also claims that it was a breach of the Indemnity Agreement for Amwest to "wrongfully" liquidate the $300,000 letter of credit that TRMI advanced as collateral security. TRMI states that this liquidation was improper because Amwest had separately agreed to give TRMI a $250,000 "credit" against any indemnity claim in return for TRMI delivering to Dade County certain construction equipment that Dade County had not yet paid for. TRMI also suggests that Amwest was not supposed to convert the $300,000 collateral because Amwest had not paid any monies over to Dade County under the payment and performance bond.

As an initial matter, Amwest was authorized to liquidate the $300,000 collateral bond without first having to pay anything to Dade County. Section 5 of the Indemnity Agreement specifically states that "collateral may be held or *utilized* by Surety [Amwest] until it has received evidence of its complete discharge from such claim or potential claims, and until it has been fully reimbursed for all loss, expense, attorneys' fees and unpaid premiums." The Collateral Receipt itself states that:

> "[t]he collateral security . . . is pledged and deposited with Surety [Amwest] as security [a]gainst any and all demands, liabilities, losses, costs . . . and expenses of whatever kind or nature which arise by reason of . . . the execution by the Surety of any Bond on behalf of the Principal and *whether or not the Surety shall have paid any sums in partial or complete payment thereof.*"

The Court therefore finds that Amwest was explicitly authorized by the Indemnity

---

**3.** Due to the importance of the specific terms of the Indemnity Agreement in analyzing TRMI's claims, the relevant provisions are reproduced at note 2, *supra.*

**4.** By its terms, Amwest's various rights (and obligations) as surety under the Indemnity Agreement were triggered when TRMI became in "de-fault." Under section 3(B) of the Agreement, one of the conditions for being in default are if "[a]ny Obligee [i.e., Dade County] declares Principal [i.e., TRMI] to be in Default." On June 16, 1995, Dade County declared TRMI to be in default and terminated it as contractor.

Agreement to liquidate TRMI's collateral for expenses incurred or expected without first having paid any amounts to Dade County.

■ In addition, the Court is not persuaded that the $250,000 collateral that Amwest subsequently offered as a "credit" against future indemnity claims in exchange for TRMI's delivery of construction equipment should operate as a bar to Amwest exercising its right to liquidate TRMI's own $300,000 collateral. Even if the $250,000 collateral was to serve as a credit against future indemnity claims, that does not necessarily imply that it would be a credit against the $300,000 collateral. The $250,000 collateral could just as well have been intended to serve as a credit against indemnification demands made upon TRMI by Amwest in excess of the initial $300,000 amount; $300,000 was by no means a "cap" on TRMI's potential liability under the Indemnity Agreement.

### c. Amwest's Dealings with Dade County

■ TRMI also claims that it was a breach of the Indemnity Agreement for Amwest to deal with Dade County in a manner contrary to the interests of TRMI. TRMI first claims that it was a breach of contract for Amwest to cooperate with Dade County in Dade County's litigation against TRMI. TRMI claims that Amwest provided witnesses, shared confidential information, and otherwise assisted Dade County in litigation against TRMI. Once again, conduct that TRMI interprets as a breach of the Indemnity Agreement is in fact specifically authorized by the Agreement. Section 8(G) of the Indemnity Agreement states that "Surety may consent to any changes or alterations in a Contract or Bond, without affecting the liability hereunder of [TRMI], including but not limited to riders extending time of completion, or increases or decreases in the penal sum of the bond ... without giving notice thereof to the indemnitors." Section 8(I) of the Agreement then authorizes Amwest to "furnish any information, which it now has or may hereafter acquire concerning [TRMI] to other persons, firms or entities ... as it may deem appropriate." These sections together gave Amwest the right, once TRMI was in default as defined by the Agreement, to en-

gage in discussions with Dade County to resolve Amwest's liability to Dade County under the payment and performance bond, including settlement discussions and sharing of information.

■ In a related claim, TRMI interprets Amwest's failure to disclose its negotiations with Dade County as another breach of the Indemnity Agreement. In section 9 of the Indemnity Agreement, TRMI specifically agreed that "[Amwest] need not give us, or any of us, notice of any act, fact, or information coming to the notice or knowledge of [Amwest] concerning or affecting its rights or liabilities under any such bond or our rights or liabilities hereunder, notice of all such being expressly waived." TRMI can hardly argue that it was entitled to be privy to discussions between Amwest and Dade County, when it had explicitly waived that right in the Agreement.

■ Finally, TRMI claims that it was a breach of the Indemnity Agreement for Amwest to agree, in Amwest's eventual Bond Cancellation Agreement with Dade County, for Amwest to receive 25% of Dade County's recovery in the TRMI–Dade County litigation. Once again, the Indemnity Agreement, in section 8(G), specifically authorized Amwest to alter the terms of its obligations to Dade County under the payment and performance bond. The Indemnity Agreement does not contain any provisions stating what terms are or are not permitted in any such settlement or understanding negotiated between Amwest and Dade County. Therefore, the Court finds that there could not have been a breach of the Indemnity Agreement.

### 2. Breach of Implied Duty of Good Faith

■ TRMI also claims that even if Amwest's actions did not constitute a breach of contract, they were a breach of Amwest's implied duty of good faith. As an initial matter, the Court notes that in analyzing whether these alleged violations constitute breaches of an implied duty of good faith, the

Court applies Florida state law.[5] While neither TRMI nor Amwest discuss the source of such a duty, the Court accepts the premise that under Florida law, there is an implied covenant of good faith in every contract.[6] Nevertheless, this Court holds that there is no genuine issue of material fact as to whether Amwest breached its implied duty of good faith, because under Florida law, "[t]he implied obligation of good faith cannot be used to vary the terms of an express contract."[7] The terms of the Indemnity Agreement, as discussed *supra*, not only do not prohibit Amwest's alleged violatory acts, but in fact specifically authorize them. The Court notes that TRMI does not, at any point, argue that the Indemnity Agreement or any of its provisions are void or voidable. The Court cannot permit Amwest's otherwise implied duty of good faith to directly negate the rights that it negotiated and procured for itself in the Indemnity Agreement.

As a sidenote, the Court observes that TRMI's claims against Amwest do not raise an issue of good faith. Despite the parties' liberal use of that term, "good faith" is concerned more with the adequacy and fairness of parties' performance under a contract.[8] Good faith is usually described as a duty to "deal fairly,"[9] or "at arms length."[10] Instead, TRMI's allegations, at their core, go beyond a duty of good faith and implicate the much stricter duty of a fiduciary.

A fiduciary has the obligation to give paramount consideration to the interests of another, not merely to observe the general standard of fair dealing as between two sophisticated commercial actors.[11] "A fiduciary owes ... the duty to refrain from self-dealing, the duty of loyalty, the overall duty to not take unfair advantage and to act in the best interest of the other party, and the duty to disclose material facts."[12] In the agency context, for example, fiduciary duty has been described as "a duty not to deal with his principal as an adverse party in a transaction connected with his agency without the princi-

**5.** The Court has jurisdiction over this action under 28 U.S.C. § 1391 (1998). In diversity actions, federal courts are to apply state substantive law under the *Erie* doctrine. *See, e.g., Fioretti v. Massachusetts Gen. Life Ins. Co.,* 53 F.3d 1228, 1235 (11th Cir.1995).

**6.** *See, e.g., Champagne–Webber, Inc. v. City of Fort Lauderdale,* 519 So.2d 696, 697 (Fla.Dist.Ct. App.1988).

**7.** *City of Riviera Beach v. John's Towing,* 691 So.2d 519, 521 (Fla.Dist.Ct.App.1997) (citing *Indian Harbor Citrus, Inc. v. Poppell,* 658 So.2d 605 (Fla.Dist.Ct.App.), rev. denied, 666 So.2d 144 (Fla.1995)). The obligation of good faith is one that is imposed on contracting parties to regulate their execution of the terms of a contract; it is not used to alter the parties' rights and obligations under those terms. *See In re General Plastics Corp.,* 158 B.R. 258, 286 (Bankr.S.D.Fla. 1993); *Burger King Corp. v. Holder,* 844 F.Supp. 1528, 1530 (S.D.Fla.1993) ("[T]he 'covenant' [of good faith] is not an independent contract term. It is a doctrine that modifies the meaning of all explicit terms in a contract. . . .").

**8.** For example, the cases cited by TRMI involve allegations of sureties inadequately or improperly performing their obligations under their contracts. *See, e.g., General Ins. Co. of Am. v. K. Capolino Constr. Corp.,* 903 F.Supp. 623 (S.D.N.Y.1995) (whether a surety should have completed the underlying construction contracts); *General Ins. Co. of Am. v. Merritt–Meridian Constr. Corp.,* No. 95 Civ. 5754, 1997 WL 187372 (S.D.N.Y.1997) (whether a surety should have made payments under surety bonds). The cases cited by Amwest also involve actions related to the adequacy or appropriateness of performance under a surety contract. *See, e.g.,General Accident Ins. Co. of Am. v. Merritt–Meridian Constr. Corp.,* 975 F.Supp. 511 (S.D.N.Y.1997) (whether a surety should have paid claims of subcontractors); *Employers Ins. of Wausau v. Able Green, Inc.,* 749 F.Supp. 1100 (S.D.Fla. 1990) (whether a surety should have issued payment and performance bonds); *Thurston v. International Fidelity Ins. Co.,* 528 So.2d 128 (Fla. Dist.Ct.App.1988) (whether surety had properly billed for attorneys' fees).

**9.** *See Associated Indem. Corp. v. CAT Contracting, Inc.,* 918 S.W.2d 580, 597 (Tex.App.1996).

**10.** *See, e.g., In re Torcise,* 116 F.3d 860, 868 (11th Cir.1997); *Weinstein v. Nevel,* 366 So.2d 159, 162 (Fla.Dist.Ct.App.1979).

**11.** *See, e.g., Beckwith Mach. Co. v. Traveler's Indem. Co.,* 638 F.Supp. 1179, 1190 (W.D.Pa.1986); *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141, 146 (Cal. 1979); *Fireman's Fund Ins. Co. v. Continental Ins. Co.,* 308 Md. 315, 519 A.3d 202, 204 (1987).

**12.** *Capital Bank v. MVB, Inc.,* 644 So.2d 515, 520 (Fla.Dist.Ct.App.1994) (citing *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939)). *See also Compton v. Fifth Ave. Assoc., Inc.,* 7 F.Supp.2d 1328, 1333 (M.D.Fla.1998).

pal's knowledge,"[13] and "a duty ... not to act on behalf of an adverse party in a transaction connected with his agency without the principal's knowledge."[14] TRMI's allegations—claims of self-dealing, breaching a duty of loyalty, taking unfair advantage, failing to act in TRMI's best interests, and failing to disclose its dealings with Dade County—are the basic elements of a fiduciary's duty.

■ However, the Court is not aware of any Florida law that recognizes the existence of a fiduciary duty as between a surety and its principal. In addition, cases from other jurisdictions generally find that no such duty exists.[15] Even those jurisdictions that do recognize a fiduciary relationship do so only in situations of unequal bargaining power, dominance, or dependence, which are the traditional requirements for inferring a fiduciary relationship.[16] In the present action, TRMI and the Rosakranses are sophisticated business actors, in the business of manufacturing toll equipment, with ample experience dealing with this type of surety relationship. It is particularly inappropriate to infer a fiduciary relationship in this action because unlike most insurance-type relationships, sureties occupy a vulnerable nexus as between the principal and the oligee—what one commentator has described as "the classic dilemma" of sureties.[17] What now appears ex post as opportunistic behavior on the part of Amwest was, at the time of TRMI's default, the prudent actions of a commercial actor defending its interests within the confines of its contractual obligations. For these reasons, the Court holds that Amwest could not, as a matter of law, have violated an implied duty of good faith.

### B. Amwest's Counterclaims

### 1. Indemnification

■ Amwest has filed counterclaims, including a counterclaim for indemnity for all losses and expenses incurred. For the same reasons as discussed in Section III.A.1, *supra*, summary judgment is warranted. Section 2 of the Indemnity Agreement is clear that Amwest is entitled to indemnity for "any and all demands, liabilities, losses, costs, damages, attorneys' fees and expenses of whatever kind or nature which arise by reason of, or in consequence of, the execution by the Surety of any Bond." The only condition to triggering TRMI's duty to indemnify is in section 2(A) of the Agreement, which states that TRMI and the Rosakranses are liable for those amounts paid by Amwest "in good faith *under the belief that* 1) principal was in default ... 2) surety was or might be liable therefor; 3) such payments were necessary or advisable to protect any of surety's rights as to avoid or lessen surety's liability or alleged liability." Unlike the implied duty of good faith that TRMI seeks to impose on its entire relationship with Amwest, the "good faith" mentioned in section 2(A) of the Indemnity Agreement is specifically defined within the Indemnity Agreement as a *subjective* belief in default, liability, and a need to

---

13. Restatement (Second) of Agency § 389 (1958).

14. *Id.* at 391.

15. *See, e.g., Insurance Co. of N. Am. v. Morris,* No. 96–1039, 1998 WL 387503 at *6 (Tex.1998); *National Fire Ins. Co. of Pittsburgh v. Califinvest,* No. 90 CIV. 2476, 1992 WL 35017 at *2 (S.D.N.Y.1992); *Latimer v. Hall Fin. Group, Inc.,* No. 90 C 0156, 1990 WL 133225 at *8 (N.D.Ill. 1990) (finding "no purpose in binding either surety or principal beyond the document that evidences their agreement"); *Northwestern Nat'l Ins. Co. v. Barney,* No. C86–3936, 1988 WL 215411 (N.D.Ohio 1988); *Abbott v. Equity Group,* CIV.A. No. 86–4186, 1990 WL 3152 (E.D.La. 1990).

16. *See Associated Indem. Corp. v. CAT Contracting, Inc.,* 918 S.W.2d 580, 596 (Tex.App.1996);

*Chapman v. Citizens and S. Nat'l Bank of S.C.,* 302 S.C. 469, 395 S.E.2d 446 (Ct.App.1990).

17. *See* John W. Hinchley, Surety's Performance over Protest of Principal: Considerations and Risks, 22 Tort & Ins. L.J. 133 (1986). As Hinchley describes the dilemma:

> The obligee demands performance, and the surety fails or refuses to perform upon pain of consequential damages, statutory penalties, interest, and attorneys' fees. On the other hand, the principal protests that because the principal is not liable to the obligee, neither is the surety liable; and further, if the surety does perform over protest of the principal, the principal will raise defenses to the surety's claim for indemnity, and may assert affirmative claims for "contract interference" and "domination."

> *Id.*

reduce liability. The Court finds that there is no issue of material fact as to whether Amwest met that specific and narrow standard of good faith. Amwest has stated that it believed TRMI to be in "default," defined in the Indemnity Agreement as including a situation where "[a]ny Obligee declares Principal to be in Default." Amwest has further stated that it believed it would be liable under its performance bonds to Dade County, and it incurred subsequent expenses in order to reduce that liability. Because Amwest exhibited subjective good faith as defined in section 2(A) of the Indemnity Agreement in its decision to incur expenses and costs, the Court finds that summary judgment should be awarded for Amwest on the issue of indemnity.

### 2. Exoneration

Amwest has also filed a counterclaim for exoneration for future expenses, costs, and losses. Under section 8(H) of the Indemnity Agreement, "Surety shall have every right . . . including the right of exoneration." The Agreement by its very terms gives Amwest the right to exoneration. Once again, the Court notes that TRMI does not dispute the validity of the Agreement itself. For this reason, the Court finds that summary judgment is warranted on the issue of exoneration.

### IV. Conclusion

Based on the foregoing, it is ORDERED AND ADJUDGED that Defendant/Counterclaim Plaintiff Amwest Surety Insurance Company's Motion for Summary Judgment (filed September 9, 1998, DE # 80) be, and the same is hereby, GRANTED. Final summary judgment is entered for Amwest:

1. on TRMI's amended complaint;
2. on Count I of Amwest's Counterclaim for Indemnity in the amount of $169,-302.34; and
3. on Count II of Amwest's Counterclaim for Exoneration for any monies that Amwest pays to Dade County in the future.

DONE AND ORDERED.